CARBORUNDUM CO. v. ELECTRIC SMELTING & ALUMINUM CO.

ELECTRIC SMELTING & ALUMINUM CO. v. CARBORUNDUM CO.

(Circuit Court of Appeals, Third Circuit.    March 15, 1913.)

No. 1,494.

1. PATENTS (§ 328*)—INFRINGEMENT—ELECTRIC SMELTING PROCESS.

The Cowles patent, No. 319,795, for a process of smelting ores or metalliferous compounds by an electric current, giving it the liberal construction to which it is entitled, *held* infringed.

2. PATENTS (§ 318*)—INFRINGEMENT—PROFITS RECOVERABLE.

On an accounting for profits, and not for damages, for infringement of a process patent, where profits to the infringer are impossible, save through his infringement, he must be treated as a trustee ex maleficio, and can withhold none of his gains from the patentee.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

3. PATENTS (§ 318*)—INFRINGEMENT—RECOVERY OF PROFITS.

On an accounting for profits, the fact that the owner of the patent has not used the thing patented is immaterial.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*]

4. PATENTS (§ 283*)—INFRINGEMENT—LIABILITY FOR PROFITS—PROCESS PATENTS.

Where a valid process patent has been granted and applied by the patentee to the production of an article, though not on a commercial scale, but there has been no abandonment by him of the right to apply the process to the production of the article on such scale, and the article can be produced only by the use of that process, an infringer who so uses it is not relieved from liability in whole or in part by obtaining a later patent on the product.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 440–450, 452; Dec. Dig. § 283.*]

5. PATENTS (§ 318*)—INFRINGEMENT—ACCOUNTING FOR PROFITS.

Taxes and insurance premiums paid by an infringer are not usually allowable to him on an accounting for profits, but are so allowable where they were paid on a plant devoted solely to the infringing business, the entire profits of which have been awarded to the patent owner.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 566–576; Dec. Dig. § 318.*

Accounting by infringer for profits, see note to Breckill v. Mayor, etc., of City of New York, 50 C. C. A. 8.]

Young, District Judge, dissenting in part.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Joseph Buffington, Judge.

Suit in equity by the Electric Smelting & Aluminum Company against the Carborundum Company. From the final decree, both parties appeal. Reversed.

See, also, 83 Fed. 492; 102 Fed. 618, 42 C. C. A. 537; 189 Fed. 710.

Francis C. McMillin, of Cleveland, Ohio, for plaintiff Electric Smelting & Aluminum Co.

Marshall A. Christy, of Pittsburgh, Pa., for defendant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before GRAY, Circuit Judge, and BRADFORD and YOUNG, District Judges.

BRADFORD, District Judge. These appeals have been taken from a final decree of the Circuit Court of the United States for the Western District of Pennsylvania made February 21, 1911, confirming the report of a master on an accounting of profits for patent infringement ordered by that court, in this case December 7, 1900. 189 Fed. 710. The original suit for infringement was brought by the Electric Smelting and Aluminum Company, hereinafter called the complainant, against The Carborundum Company, hereinafter called the defendant, for infringement of three United States patents, No. 319,795 for "Processes for Smelting Ores by the Electric Current," No. 319,945 for "Electric Smelting Furnaces," and No. 335,058 for "Electric Furnaces and Method of Operating the Same." The two first named patents were issued to Eugene H. Cowles and Alfred H. Cowles June 9, 1885, and the last named patent to Alfred H. Cowles January 26, 1886, and all of these patents were assigned to the complainant. At the final hearing in the Circuit Court the charge of infringement of patent No. 335,058 was abandoned, and that court held that neither of the other two patents had been infringed. 83 Fed. 492. On appeal to this court the decree of the Circuit Court was in May, 1900, affirmed as to patent No. 319,945, but reversed as to patent No. 319,795; it being held by this court that claims 1, 2 and 4 of the last named patent had been infringed by the defendant, and the case was referred by the court below pursuant to the decree of this court to a master for an accounting of profits derived by the defendant from the infringement. The defendant thereafter and while the case was in the hands of the master adopted, January 1, 1901, what it claimed to be a different and non-infringing process, and in the language of its counsel, "did it almost on the instant," and claimed that it was not bound to account for any profits derived from its manufacture and sale of carborundum after December 31, 1900, as at that time it discontinued using the process held to have been infringed. This claim the complainant denies, contending that the alleged new process was a clear infringement of patent No. 319,795. The master decided in December, 1906, that the alleged new process was not an infringement of that patent, limited the accounting to December 31, 1900, and made an award of $22,411.62 in favor of the complainant, all of which was confirmed by the court below. Before taking up the question of the sufficiency of the sum awarded to the complainant as profits during the accounting period up to and including December 31, 1900, we shall briefly consider whether the defendant was not thereafter guilty of infringement of the complainant's process for which it should have been compelled to account.

[1] We think the court below was in error in holding that the process employed by the defendant from and including January 1, 1901, to June 9, 1902, the date of the expiration of patent No. 319,795, was not an infringement of that patent, and that the complainant was not entitled to profits gained by the defendant from the use of that process during that period. This court in and by its decree in 1900 reversed

the decree of the court below and decided that claims 1, 2 and 4 of that patent were valid and had been infringed by the defendant. These claims are as follows:

"1. The method of generating heat for metallurgical operations herein described, which consists in passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore to be treated by the process being brought into contact with the broken or pulverized resistance material, whereby the heat is generated by the resistance of the broken or pulverized body throughout its mass, and the operation can be performed solely by means of electrical energy.

"2. The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of carbon to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the carbon and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass.

"3. The method of smelting or reducing ores or metalliferous compounds herein described, which consists in subjecting the ore in the presence of a reducing agent to the action of heat generated by passing an electric current through a body of broken or pulverized resistance material that forms a continuous part of the electric circuit, the ore being in contact with the broken or pulverized resistance material, whereby the ore is reduced by the combined action of the reducing agent and of the heat generated solely by the resistance of the broken or pulverized body throughout its mass."

The claims of the patent should be liberally construed for reasons heretofore given by this court in this suit, as follows:

"On careful examination we have failed to find in any patent, publication or other matter alleged as an anticipation or as showing the prior art, a practical process for metallurgical or analogous operations involving the use of a discrete body of conductive but resistant material rendered incandescent by the passage of an electric current and mixed or otherwise in contact with the material to be treated. This is the broad, underlying idea of the process patent in suit, and is well covered by its claims. The Messrs. Cowles were the first to invent and use this process and the patent must be sustained. It is a meritorious one and its claims are entitled to considerable liberalty of construction."

This court has declared in this case in relation to the core used by the defendant:

"The use of the central core of resistance material is within the process of the appellant under claims 1, 2 and 4. These claims require merely contact in contradistinction to a mixture between the resistance material and material to be treated, and it is immaterial whether, under those claims the body of resistance material assumes the form of a central core or any other shape, so long as it is in contact with the material to be treated, is discrete, granular or pulverized in its composition, is rendered incandescent through the passage of electric current through its mass or over its area, and thereby affords the heat to effect the desired end."

And further:

"If claims 1, 2 and 4 are broad enough to include actual contact of any kind between the two materials, the resistance material forming part of the electric circuit may be in contact with the material to be treated, whether in the form of a core or several cores, or of strata, or in any other form, to secure the most effective operation of the process under varying condi-

tions involving the nature of the material to be treated, amount of the charge," etc.

And in the description of the patent it is stated:

"The scope of this invention is not limited by the degree of granulation, as that may vary with the conditions of the case, and with a large furnace and a powerful current the size of the carbon particles may pass beyond what is ordinarily understood by the term 'granular' and be in fact pieces of carbon of considerable size."

The defendant in its alleged new process employed a block core consisting of a number of blocks of electric-light carbon, each thirty-two inches long and four by four inches in thickness. They are arranged in "zig-zag" fashion and the ends of each two blocks forming a V rest upon a carbon block from twelve to fourteen inches long and four by four inches in thickness, called a connector block. A large quantity of fine granular or pulverized carbon, or graphite, is disposed between the carbon blocks and around their ends on the connector blocks, and also a large quantity of granular or crushed coke is disposed at each end of the furnace to convey the electric current to and from the electrodes to the block core, that core being in electrical connection with the electrodes at each end of the furnace. Notwithstanding the difference in the arrangement of the resistance material we are satisfied on the evidence that the alleged new process practiced by the defendant since December 31, 1900, is the process, the use of which by the defendant this court held to infringe claims 1, 2 and 4 of patent No. 319,795; the mere mechanical difference in the form and arrangement of the core not serving to affect or change the nature of the process or to shield the defendant from responsibility. The defendant must, therefore, be required to account to the complainant for all profits gained by the former from its manufacture of carborundum under the alleged new process, and its sale, from and including January 1, 1901, to June 9, 1902.

The sum of $22,411.62 awarded to the complainant by the court below as the amount of profits it was entitled to receive from the defendant on the accounting up to and including December 31, 1900, was ascertained by the master in the following manner: He found from the evidence including the testimony of expert accountants on both sides that the total net profits of the defendant during the accounting period from its carborundum operations and operations including the use of carborundum, after deduction by the defendant of certain items of expense, amounted to $78,635.18. The items of expense above referred to were $7,477.09 paid by the defendant for taxes, $8,305.35 paid by the defendant for insurance, and $10,108.12 charged on its books for depreciation, aggregating $25,890.56. The master found that the above three items had been improperly deducted from the profits so made by the defendant during the accounting period and added their sum to the $78,635.18, making the total net profits $104,-525.74. To the disallowance by the court below of the above three items the defendant has assigned error. After disallowing the above items claimed by the defendant the master deducted from the $104,-525.74, representing total profits, 49.55% thereof, or $50,792.51 for "profit properly belonging to the invention of the defendant of the

product, carborundum itself," and "the profit belonging to the invention of defendant·of the bonding material, that under the evidence made the great bulk of· the sales of carborundum possible by the defendant company." After deducting from the total profits the above sum of $50,792.51 the master apportioned to the complainant, but subject to further deduction, the remaining 50.45%, amounting to $52,-733.23. This apportionment was arrived at by ascertaining that the cost of the entire output of the defendant's business during the period of infringement was $469,665, and that the cost of making carborundum, including its cleaning, crushing, grading and preparation for sale, was $236,944.53, or 50.45% of the total cost of the defendant's output, and by assuming that "each dollar of expenditure by the defendant earned an equal amount of profit." He then proceeded to deduct from the above sum of $52,733.23 15% thereof as representing the difference ·between the "whole cost of carborundum production" and the "furnace cost," being $7,909.99, leaving a balance, subject to further deduction, of $44,823.24 as "the part of the profits to which the use of complainant's process in the production of carborundum contributed, after consideration of the foregoing elements as entering into that profit." The master next proceeded to deduct one-half of the above sum of $44,823.24 as the amount of the supposed contribution to the defendant's profits through its ownership of an Acheson patent and its re-issue for carborundum granted subsequent to the issuance of patent No. 319,795 in suit, and awarded to the complainant the remaining half, namely, $22,411.62 as the total amount it was entitled to receive under the accounting ordered by the court below pursuant to the decree of this court, together with the costs of accounting. The master allowed interest on the above sum so awarded to the complainant from the confirmation of his report. And the court below in its decree of February 21, 1911, confirming the master's report ordered that the defendant recover of the complainant "the costs of the taking of proofs before the master with respect to the charge of infringement by it, subsequent to December 31, 1900, and that the defendant have execution therefor," and further ordered that "the fees and expenses of the master, to be hereafter fixed, be equally divided between the parties * * * and execution to issue therefor."

The complainant contends that in addition to such sum as may be decreed to it for profits made by the defendant from its infringement of patent No. 319,795 during the period from December 31, 1900, to June 9, 1902, the complainant is entitled to recover from the defendant the above sum of $104,525.74 without deduction. This contention is based upon two grounds: First, that whatever profit there is or has been in the defendant's business has been derived solely through its infringement of the complainant's process, and, secondly, that, if it be assumed that the first ground is untenable, there has been such negligence on the part of the defendant in failing to keep accounts showing the amount of profit derived by it from the infringement, that the complainant is entitled to recover the total profits of the defendant's business. The first of these grounds we think is well taken. It clearly appears from the evidence that the business of the defendant is based upon and practically confined to the manufacture and sale of

carborundum in one form or another. As stated by the court below in its opinion (189 Fed. 710) as to a proper form of decree to be made under the decision of this court on final hearing (102 Fed. 618, 42 C. C. A. 537):

"The respondent has a large plant built and adapted for the manufacture of carborundum. The machinery and apparatus were likewise built for that special work. It is respondent's sole business, and in that article and its various applications they have built up a large trade and extensive use."

The making of wheels, cloth, paper, etc., covered in whole or in part with carborundum is wholly subsidiary or incidental to its advantageous sale. Admittedly it would be impossible for the defendant without its wrongful use of the complainant's process to carry on its carborundum operations. Not only could it earn no profits, but its business would cease to exist; for no other process for the manufacture of carborundum than that of the complainant has been disclosed.

Much has been said on the subject of the Acheson process and product patents No. 492,767 of February 28, 1893, and re-issue No. 11,473 of February 26, 1895, for "Improvements in the Production of Artificial Crystalline Carbonaceous Materials." In the description in both of these patents Acheson states:

"My invention consists in the various processes and products of said processes substantially as hereinafter more particularly set forth. * * * I do not limit myself to any of the particulars set forth, as I intend to cover and claim broadly the new crystalline carbonaceous materials whether produced by the particular processes or methods set forth, or by any substantially equivalent methods, and for all purposes to which it may be applied." ·

And his claims were as broad as his statement of invention. It is contended in substance by the defendant that the patent in suit, while covering the process of manufacturing carborundum, does not cover the article itself; that Acheson was the original inventor and discoverer of the article; that the defendant as his assignee has a monopoly in that article however or wherever or by whomsoever produced in this country; and therefore that the carborundum sold by the defendant in the conduct of its business, although manufactured in defiance of the patent in suit, must be treated as a contribution by the defendant towards profits realized and be considered on the accounting in question.

[2] A valid process patent, though for a process only, confers on the patentee a right to exclude all others from using such process for the attainment of its object. Others may secure the desired result, if they can, by the employment of a different process, if open to them, but they cannot without the leave or license of the patent owner use the patented process with impunity. And on an accounting for profits, and not for damages, in a case of infringement, where profits to the infringer are impossible save through his infringement, he must be treated as a trustee ex maleficio and can withhold none of his gains from the patentee. The fact that in such a case the patent is not for the product, but only for the process, is wholly immaterial; for the infringer will not be permitted by a court of equity to take advantage

of his own wrong, but will be held accountable as a trustee of the profits.

It is well settled that, in the case of mechanical inventions, where the infringed patent covers a mere improvement upon mechanism before known and open to the defendant to use, the complainant can recover only the excess of such profits as have been realized through the use of the improvement over what the defendant might have made by the use of such mechanism without such improvement. But it is equally well settled, that where the entire commercial value of the mechanism arises from the patented improvement the owner of the patent will be entitled to recover from the infringer the total profits derived from the manufacture, use or sale of such mechanism. Crosby Valve Co. v. Safety Valve Co., 141 U. S. 441, 12 Sup. Ct. 49, 35 L. Ed. 809; Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222; Manufacturing Co. v. Cowing, 105 U. S. 253, 26 L. Ed. 987; Hurlbut v. Schillinger, 130 U. S. 456, 9 Sup. Ct. 584, 32 L. Ed. 1011; Maimin v. Union Special Mach. Co., 187 Fed. 123, 109 C. C. A. 41; Wales v. Waterbury Mfg. Co., 101 Fed. 126, 41 C. C. A. 250. Manufacturing Co. v. Cowing, supra, is strongly analogous to the present case. There the court said:

"If the improvement is required to adapt the machine to a particular use, and there is no other way open to the public of supplying the demand for that use, then it is clear the infringer has by his infringement secured the advantage of a market he would not otherwise have had, and that the fruits of this advantage are the entire profits he has made in that market."

The above language was quoted and practically applied by this court in Maimin v. Union Special Mach. Co., supra. And this rule applies although the mechanism without such patented improvement may not be wholly worthless. Nor is it proper in an account of profits in such a case to make any allowance to the defendant on account of improvements covered by patents owned and used by the defendant but of a date subsequent to the issue of the infringed patent. Crosby Valve Co. v. Safety Valve Co., supra. In that case the defendant unsuccessfully sought a division of profits on the ground, among others, that it held and owned a patent for a steam safety valve; which patent, however, was subsequent to the infringed patent for a steam safety valve invented by one Richardson and acquired by the complainant. The court said:

"It appearing that the defendant's valve derived its entire value from the use of the Richardson invention covered by the patent of 1866 and that the entire value of the defendant's valve, as a marketable article, was properly and legally attributable to that invention of Richardson, the plaintiff is entitled to recover the entire profit of the manufacture and sale of the valve."

[3] Nor is the application of the rule affected in a case where profits, and not damages, are to be accounted for by the fact that the owner of the patent has not used the mechanism containing such patented improvement. Crosby Valve Co. v. Safety Valve Co., supra. The principle of the foregoing cases, involving the consideration of mechanical inventions, is not without much weight in the determina-

tion of the question of profits in the case before us. We think it applies a fortiori here, as it was only through the infringement of the complainant's process, that profits were made or indeed were possible. For, as above stated, no other process than that of the complainant is disclosed under which carborundum can be manufactured.

Further, the holder of a valid process patent has a right, not only to manufacture under the patented process, but to use and sell the product, unless that product be the subject of a valid patent monopoly in favor of another person. The defendant contends that under and by virtue of the Acheson patent it has a monopoly in the product carborundum. If it had such a monopoly it would seem to follow that, save in so far as equitable considerations might produce a different result, it would have the exclusive right to use and sell carborundum, whether wrongfully manufactured by itself, or rightfully manufactured by the complainant; and in the latter case under the process patent upheld by this court as valid and meritorious, while the complainant would have the exclusive right to manufacture carborundum under its process, it would be powerless to use or sell a pound of such manufactured product. It is not perceptible that under such circumstances the process patent would have any value. A clear case should be made to justify the court in treating the defendant's product patent as operative or enforceable against the complainant and thus practically nullify the process patent so far as it covers the manufacture of carborundum. Acheson did not discover, invent or have any idea of carborundum until long after the patent in suit was granted. On final hearing, not only his patents but much evidence touching his connection with the product, were before this court when it was said:

"We have no doubt on the evidence that carborundum can be and has been produced under the process covered by any one of the claims of the process patent in suit, although not so efficiently or profitably under the method of claim 3. So long ago as 1884 the Messrs. Cowles produced it under their process with and without the use of a prepared or pre-formed central core of resistance material. It is true they did not manufacture it for commercial purposes and, failing to appreciate its importance, though aware of its abrasive qualities, applied their process to other branches of metallurgy."

And further:

"The Messrs. Cowles were the first to invent and use this process and the patent must be sustained."

It appears from the evidence that, although carborundum was not manufactured on a commercial scale before the Acheson product patent was obtained, specimens of carborundum made by the Messrs. Cowles and The Cowles Electric Smelting and Aluminum Company, the assignor of the complainant, were placed on exhibition in different parts of the country and much notoriety was given through lectures and printed publications to the incandescent feature of the patent in suit. The Messrs. Cowles, it is true, failed to appreciate the importance of the product, as above stated, and did not know it by the name of carborundum—for it had not yet been so christened—and were not familiar with its composition, but they were aware of its highly abrasive qualities. There is no evidence that the Messrs. Cowles or their

successors in the title to the process patent in suit ever intended to abandon that process so far as the manufacture of carborundum is concerned. The fact that they exhibited from time to time and in different places specimens of what is now known as carborundum strongly indicates 'an intention on their part not to exclude that product from the operation of the process patent. This court has decided that the process patent in suit is valid, meritorious, and entitled to considerable liberality of construction.

[4] This case presents some unusual features. Under the process patent No. 319,795 the Messrs. Cowles and The Cowles Electric Smelting and Aluminum Company had a right, fully sustained by this court, to manufacture carborundum, and they also had a right,—certainly until the Acheson patent was obtained,—though not necessarily an exclusive right, to use and sell any carborundum made by them. In fact they did make carborundum under the patented process though not on a commercial scale. As before stated, there is no evidence that they or the complainant ever abandoned the right to apply the patented process to the manufacture of that article. The Acheson patent and its re-issue, which were obtained a number of years after the patent in suit, claimed not only carborundum but also a process for the production of that article. This court has decided that the defendant in using the process claimed by Acheson used the process of the patent in suit and was guilty of infringement. It does not appear that there was any other process under which carborundum could be produced. If the Acheson patent so far as it claims the product in contradistinction to the process should be held to confer upon the defendant the exclusive right to use and sell carborundum, then, as before indicated, the complainant's process patent was held absolutely at the mercy of the defendant; for the bare right to manufacture without a right to use or sell what is manufactured is valueless. While it has repeatedly been stated that a patent may be obtained for a process in contradistinction to its product, or for a product in contradistinction to the process under which it is created, we can recall no case in which it has been held that after a valid process patent has been granted and applied to the production of an article, though not on a commercial scale, and there has been no abandonment by the patent owner of the right to apply the process to the production of the article on such scale, and such article can be produced only under that process, another person can obtain a patent conferring upon him an exclusive right, as against the holder of the process patent, to the use and sale of the article so produced and thereby wholly destroy the value to him of the process patent so far as it may be applied to the production of such article. If such a product patent can validly be obtained it would be necessary in order to avoid gross injustice to the owner of the process patent that all profits rendered possible only through the infringement of the process patent should be awarded to the latter, and to that end that the infringer should be treated as a trustee ex maleficio of the profits. Patents are not granted to serve as instrumentalities for the perpetration of fraud or the doing of injustice. They are property, but like other property must be used legitimately. We perceive no reason why the aphorism *sic utere tuo ut alienum non lædas* is not

applicable to the use of a patent as well as of other property. To permit one who holds a subsequent product patent to infringe a prior process patent, without which process the product could not be created, and then shield himself in whole or in part from liability for his wrongdoing by setting up his product patent, would not accord with the principles usually obtaining in courts of equity. Under such circumstances the least that equity demands is that the wrongdoer be compelled to disgorge his ill-gotten gains. But it is not necessary that we should in this case express an opinion upon the validity or invalidity of the Acheson product patent or its re-issue. For whether the defendant did or did not hold a valid patent for carborundum as a product is, as has appeared, immaterial to the decision of the question of profits; for profits having been rendered possible only through the infringement of patent No. 319,795 the whole amount under the doctrine of the authorities above cited must be awarded to the complainant.

In view of the conclusions reached it is also unnecessary to decide the point made by the complainant touching the alleged failure by the defendant to keep proper accounts of profits.

With respect to the item of depreciation which the defendant contends should have been allowed to it in the computation of profits we think that both the court below and the master rightly decided that this item should not be allowed to the defendant. It amounted to $10,108.12 and represented a transaction occurring years after the termination of the accounting period and could in no way affect the accounting.

[b] Taxes and insurance premiums cannot usually be allowed in the computation of profits derived from infringement, but this case is exceptional in that the complainant is entitled to all the profits of the defendant's business realized during the accounting period. As the counsel for the defendant in his printed brief says:

"The present case, however, is entirely different. The defendant company paid its taxes on land, buildings, and machinery which had been purchased, erected and installed for the express and only purpose of carrying on the manufacture and sale of carborundum. * * * The insurance premiums were here paid for the benefit of the infringing business, and nothing else. * * * Defendant, therefore, was obliged to pay taxes and insurance premiums on property which would not have existed if it had not been for the infringing operation."

We therefore think that the court below erred in disallowing the tax and insurance items, aggregating $15,782.44, and that the same should have been deducted from the sum of $104,525.24, profits realized during the infringing period up to and including December 31, 1900, and that the balance, namely, $88,743.30 should have been found due from the defendant to the complainant, together with interest thereon from February 21, 1911, in addition to the total profits derived from the manufacture and sale of carborundum by the defendant under the alleged new process from and including January 1, 1901, to June 9, 1902, the date of the expiration of the complainant's process patent, together with interest thereon.

We think the court below further erred in decreeing that the defendant recover from the complainant the costs of taking proofs before the master with respect to the charge of infringement by the defendant subsequent to December 31, 1900, and that the complainant should pay one-half of the costs of the master theretofore incurred.

The decree of the court below must be reversed, with costs to The Electric Smelting and Aluminum Company in this court and the court below, and this case remanded to the court below with directions that The Electric Smelting and Aluminum Company recover from The Carborundum Company upon a further accounting in the court below the total profits realized by the latter from its manufacture of carborundum and its sale from and including January 1, 1901, to June 9, 1902, together with legal interest thereon from the proper date; and further, that The Electric Smelting and Aluminum Company recover from The Carborundum Company the above mentioned sum of $88,743.30, together with legal interest thereon from February 21, 1911; and that such further proceedings be had in the court below as shall dispose of this case in accordance with the views herein expressed. A decree may be prepared and submitted.

YOUNG, District Judge, concurs in the foregoing opinion so far as it finds the Carborundum Company guilty of infringement of the process patent in suit during the period from and including January 1, 1901, to June 9, 1902, but dissents from such opinion so far as it holds that the profits realized by the Carborundum Company from its infringement of said patent, together with interest and costs, should not be apportioned between the parties in accordance with the decree of the court below, but awards the total profits, interest thereon, and costs to the Electric Smelting & Aluminum Company.