## W. W. SLY MFG. CO. v. PANGBORN CORPORATION.

(District Court, D. Maryland. November 25, 1921.)

1. **Patents ☞314—Petition to reopen case in infringement suit denied.**

   A petition by defendant in an infringement suit, filed after an interlocutory decree for complainant, and after an accounting of profits has been taken and reported, for leave to reopen the entire case to introduce evidence of anticipating patents, will not be granted, where no good reason is shown why such evidence could not have been known at the time of the hearing.

2. **Patents ☞318(6)—Defendant held not entitled to interest on capital invested in manufacture of infringing articles.**

   A defendant, on accounting for profits of infringement, is not entitled to an allowance of interest on the capital invested in the manufacture of the infringing articles, where that was only a part of its business, and it is impossible to satisfactorily apportion the interest between the kinds of business.

3. **Patents ☞318(6)—Credit allowance to infringer for excess profit taxes paid.**

   A defendant, on accounting for profits of infringement, where manufacture and sale of the infringing article was only part of its business, *held* entitled to allowance for excess profit taxes paid, computed on the amount of the profits found at the same rate that its entire tax paid bore to all its taxable profits, but with a proviso in the decree securing to complainant a reduction of said allowance by any sum that might thereafter be deducted from the taxes defendant would otherwise have to pay by reason of its payment of the decree.

In Equity. Suit by the W. W. Sly Manufacturing Company against the Pangborn Corporation. On settlement of final decree.

Frank V. Moale and Hull, Smith, Brock & West, all of Cleveland, Ohio, for plaintiff.

Edwin F. Samuels, of Baltimore, Md., and William F. Hall, of Washington, D. C., for defendant.

ROSE, District Judge. It has been about 20 months since in this case an opinion was handed down (263 Fed. 394), holding that the patent in suit, No. 710,624, issued October 7, 1902, to William W. Sly, was valid, and that the defendant had infringed its second claim. On the 3d of May, 1920, an accounting was accordingly decreed, but, as the patent had by that time expired, no injunction was granted. On the 3d of June, 1920, the defendant filed the statement required by the decree, which showed that the gross sum received from the sale of the infringing device had been quite large, exceeding $220,000, although, according to defendant's calculation, made in the same return, the net profit was comparatively small, being less than $20,000.

The plaintiff declined to accept as conclusive the defendant's return and on the 26th of June, the parties stipulated in writing that, instead of the usual master being appointed, the court should name a certified accountant to examine the defendant's books, vouchers, and other pertinent records, for the purpose of ascertaining the profits made by the defendant in the manufacture and sale of screen dust

arresters, covered by the return already mentioned. They further agreed that they would abide by the report of the accountant as to the facts found by him, either party reserving the right, upon its coming in, to submit to the court questions of law as to the propriety of any items considered by the accountant in arriving at defendant's profits. Thereupon one Raymond C. Reik was appointed special examiner, for the purposes above named.

Nevertheless, on the 4th of August, 1920, the defendant moved to reopen the case, for the purpose of taking testimony to establish such laches on the part of the plaintiff as would deprive it of all right to an accounting. The petition was denied, and that for two reasons:

(1) The facts supposed to sustain it had long been known to defendant's president. It is true that the affidavit supporting the request for leave to take further testimony stated that he had been ill at the time of the hearing and for an appreciable period before; but, as the same ground of defense was set up in the answer, counsel must have known of its existence, or at least some of the facts relied on to sustain it; otherwise, they could scarcely have advised their client to swear that it existed. So far as the record shows, and as my recollection goes, there was no application for a postponement of the final hearing on the ground of the unavoidable absence of an important witness, and at it no effort to show laches was made.

(2) It did not appear that, if the defendant had been permitted at the rehearing to prove all that it had tendered itself ready to prove, the result would have been different. Its infringements were of comparatively small extent until some time in 1916. Before that time, they may well either have escaped plaintiff's notice or have been, so far as it learned of them, too trifling to justify litigation.

On the day the court denied the petition for rehearing, the defendant filed a motion in which it asked leave to take substantially the same testimony before the special examiner in the accounting. The grounds upon which the first petition for rehearing was denied were equally applicable to the second, and there was the additional reason that the examiner had been selected by the court and the parties for his skill in accountancy, and not for any supposed experience in passing upon such questions as those involved in the investigation of laches in the institution of infringement suits.

The examiner filed his report and account on January 25, 1921. On the 6th of April the defendant moved for leave to take additional testimony to show that other devices were available to it at the time it made and sold the infringing screens. This motion appeared to be in the teeth of the agreement of the parties that the accountant's findings should be final as to the facts, only questions of law being reserved for the determination of the court.

[1] On May 28th counsel for the defendant filed a petition for leave to file a supplemental bill, and by it to reopen the entire case for the purpose of setting up two patents that had not been introduced at the original hearing. The petition alleged that these patents were discovered as the result of a visit to a concern from which, some

13 years before, defendant had purchased dust arresters. The fact that such purchases had been made, and from whom, had been testified at the original hearing. Apparently an investigation at that time would have unearthed all which it is now said was discovered so recently, and would have saved a great waste of time and money to everybody concerned. The patents, which it sought to bring in, if admitted, would seemingly not justify a 'finding of anticipation. At least, that is the impression that their examination makes upon my mind. So long as a court has a case within its control, it will be indisposed to shut its ears to any information which shows that it has done, or is about to do, injustice to any one; but, on the other hand, the pressure on the available time of all judicial tribunals is now so great that in fairness to the many litigants at their bar, to some of whom delay of justice is tantamount to a denial of it, one who asks for a rehearing must be required to bring himself within the long-established rules governing such applications. It does not appear that the defendant has done so. The application for leave to file a supplemental bill is accordingly denied.

[2] The special examiner found that, during the six years next preceding the institution of the suit, the defendant had realized from the manufacture and sale of the infringing device net profits to the amount of $50,543.08. The defendant objects that it was not given credit for interest on its capital invested in the making and selling of the infringing device, nor for the amount it paid out of its profits for income and excess profit taxes. Each of these objections require consideration.

Proper credit has been given to defendant for depreciation in building, plant, machinery, tools, etc., and also for all interest upon money borrowed by it. The examiner reports that the obstacles to making a fair and equitable apportionment of capital employed in the dust arrester business seem to be insurmountable, but that, at the request of defendant's counsel, he ascertained that, if the entire capital of the defendant invested in its business were apportioned in the ratio of the sale of dust arresters to total sales, interest at 6 per cent. on the proportion of capital so assumed to have been used in the dust arrester business would amount to $6,549.48. In his report he points out that such an apportionment would necessarily ignore such vital elements as that only a small part of the physical plant might have been used in the manufacture of dust arresters and the major portion for other business, or vice versa; that raw materials and supplies for use in making dust arresters might comprise much or little of the inventories on hand; that the accounts receivable might contain a great or little amount due from purchasers of dust arresters; that money borrowed on mortgage or notes payable might or might not have been used in the dust arrester portion of the business, etc.

The defendant relies upon two Circuit Courts of Appeals decisions—one, Western Glass Co. v. Schmertz Wire Glass Co., 226 Fed. 730, 141 C. C. A. 486, in the Seventh Circuit; and the other, Oehring v. Fox Typewriter Co., 251 Fed. 584, 163 C. C. A. 578, in the second—

to which may be added two earlier cases in the Circuit Courts for the Northern District of New York and Vermont, respectively, viz. Troy Iron & Nail Factory v. Corning, Fed. Cas. No. 14,196, and Steam Stonecutter Co. v. Windsor Mfg. Co., Fed. Cas. No. 13,335. The plaintiff counters with Providence Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, with the holdings of the Circuit Courts of Appeals for the Sixth and Eighth Circuits respectively, in Kissinger-Ison Co. v. Bradford Belting Co., 123 Fed. 91–94, 59 C. C. A. 221, in which the opinion was written by Mr. Judge, afterwards Mr. Justice, Lurton, and Coffield Motor Washer Co. v. Wayne Mfg. Co., 255 Fed. 561, 166 C. C. A. 626, and with Expanded Metal Co. v. General Fireproofing Co. (D. C.) 247 Fed. 899, in the Northern District of Ohio.

There is, of course, no question that in Rubber Co. v. Goodyear, supra, the Supreme Court flatly denied that interest on infringer's capital should be allowed as a part of his expense of doing business, because to do so would be to permit the wrongdoer to make a profit on his money. Legal interest is as large a return as most people can obtain from their investments. The opposite conclusion, reached by the Circuit Court of Appeals for the Seventh Circuit, in Western Glass Co. v. Schmertz, supra, is expressly based upon the assumption that it was but giving practical application to the views expressed by the Supreme Court itself in the later case of Seabury v. Am. Ende, 152 U. S. 561, 14 Sup. Ct. 683, 38 L. Ed. 553, where, although the refusal of the court below to allow interest was affirmed, it was said:

"We do not wish to be understood as holding that, in no case where the plaintiff's damages are measured by the defendant's profits, ought there to be an allowance, in the latter's favor, of interest on the money invested in the plant. Nor do we say that such an allowance may not be properly made, even where the use of the plant is not wholly restricted to making the infringing article. *But the evidence, in such a case, should enable the matter to satisfactorily apportion the interest between the several kinds of business.*" (The italics are mine.)

That is precisely what the master has reported in this case he cannot do, and that he cannot, would seem, in view of the latest utterances of the Supreme Court on the subject, to be conclusive. Walker on Patents (5th Ed.) 812.

The defendant's exceptions to the examiner's report, in so far as they are based on his failure to allow interest on the capital employed in making and selling the infringing device, is therefore overruled.

### Income and Excess Profit Taxes.

[3] The defendant claims to be entitled to deduct from those profits of its infringement, which it must pay over to plaintiff, the sums laid out by it for excess profit and income taxes upon those profits. The earlier rule, as followed by no less eminent authority than the present Chief Justice, was that no allowance would be made to infringer for the taxes he had paid. National Folding Box & Paper Co. v. Dayton Paper Novelty Co. (C. C.) 95 Fed. 994. Subsequently, in the case of Carborundum Co. v. Electric Smelting & Aluminum Co., 203 Fed. 985, 122 C. C. A. 276, the Circuit Court of Appeals for the Third Circuit,

while recognizing that ordinarily allowance cannot be made for taxes and insurance premiums, held that as the case before it was exceptional, in that the patentee was entitled to all the profits realized from defendant's business during the accounting period, the defendant should be permitted to deduct the taxes it had actually paid. The Circuit Court of Appeals for the Second Circuit in Gordon v. Turco-Halvah Co., 247 Fed. 492, 159 C. C. A. 541, carried the exception a step further. There three-fourths of the defendant's business consisted in making and selling the infringing device, and it was given an allowance for three-fourths of the taxes. The court said:

"General charges of the character of insurance and taxes can only be apportioned upon that part of the profits which the infringing device affects; but, when this can be accurately done, it is in accordance with equity and good sense that the defendant should get credit for what was a necessary condition to the creation of profits at all."

It was with ordinary property taxes that the courts were concerned in the cases cited. They do not appear to have been considerable in amount. Whether an allowance may be made for excess profit or income taxes in patent accounting has not before been raised in any reported case, so far as I know. Whether credit should be given an infringer for such taxes is a problem at once far more important and far more difficult than those heretofore dealt with. In the case at bar, if an allowance is to be made at all, it will be relatively large. By one method of calculating it, it would amount to 54 per cent. of all the net profits from the infringement, an illustration, by the way, of how heavy modern taxes are as compared with any with which we were familiar in ante bellum days.

There is no easy or sure way of determining the amount of the allowance to be made defendant, if it is entitled to any. Then there is a high probability that, if it pays the plaintiff any considerable sum, it will ultimately get back in effect an appreciable portion of the tax the government has heretofore exacted. The operation of the surtax gives opportunity for almost endless dispute. For example, the defendant says that it should be allowed for the excess of tax it paid over what it would have paid had it made no profit out of dust arresters. The plaintiff answers that under no circumstances should the deduction exceed the amount which would have been payable on the infringing profits, if they had been the only profits defendant made. Plaintiff argues that it should not be penalized because the other business of the defendant was, in proportion to the investment of capital therein, so profitable as to subject defendant to a high surtax.

A simple test would seem to show that neither of these contentions is logically sound. Let a case be assumed of a defendant whose sole business consisted in the infringement of three distinct patents, each of which is owned by one who had no interest in either of the others. He is separately sued by each patentee, and is required to account in each case. If he received an allowance in each of these accountings, calculated in the way for which defendant here contends, the aggregate would greatly exceed his payments to the government. On the other

hand, if the plaintiff's rule was applied, he would be credited with less than he was actually out of pocket on tax account.

The special examiner, in determining what allowance, if any, should be made, uses a method not open to either of the objections above set forth. He calculated the percentage the tax paid by the defendant was of all defendant's taxable profits, and then applied it to the portion of the profits he had already ascertained to have been derived from the infringing device. The result was $23,725.36, or more than 46 per cent. of the net profits from the infringement. He declined to make any allowance on account of these taxes, partly because, for the reasons already stated, it was not possible to apportion defendant's total tax payments to the infringing and noninfringing portions of its business by any methods not open to criticism, principally perhaps because, under the existing tax system, defendant, if it paid such decree as should be here made against it, would almost certainly get back in effect some portion of the tax the government had already received from it, and conceivably might have it all returned. In the year in which it paid the decree, the amount so paid would be a business loss or expense deductible from whatever profits it otherwise would be taxed for. If there is no change in our tax laws before such payment is made, and the year in which it is made happens to be one otherwise profitable to the defendant, the credit might reduce its taxes to an amount fully equal to all that it has heretofore paid. On the other hand, if during the 12 months in which it satisfied the decree, it has made no profit at all, no part of the tax paid by it would come back, either in form or in fact. So far as one can now foresee, the larger part of it is not likely to be returned.

In a case in which as many questions have been raised as in this, any decree will almost certainly be appealed. There is no probability of its being satisfied before 1922, at the earliest. The excess profit tax will apparently expire with the current calendar year. Thereafter corporations, such as defendant, will pay taxes at a rate which will not in all probability exceed 12½ per cent. and may be less. If so, and the defendant pays the plaintiff the full amount the special examiner finds to be due, the most it can recover, in the form of a reduction in its taxes, will be 12½ per cent. of $50,543.08, or $6,317.88. To make any allowance at all, in the face of the many uncertainties which attend any determination of the amount to be allowed, will be to take a step, and a long step at that, beyond anything authorized by any decided case. Nevertheless, I cannot help feeling that, in view of the high taxes now levied upon business profits, it would be utterly unfair to ignore them in determining the amount of the net gain which an infringing defendant should turn over to a plaintiff. If a patentee is damaged by a defendant's infringement, and proves the extent of it in dollars and cents, the defendant must reimburse him, and that without regard to whether the wrongdoer has otherwise made a loss by his actions; but where the owner of the patent seeks to charge the infringer, as a trustee, with the profit made, no arbitrary rule should require him to turn over a sum greatly exceeding any profit the law has allowed him to keep

for himself. Only equity can award profits, and, in equity, equity must be done. Under the facts at bar, what is equity?

In the first place, the deduction to which defendant would be entitled, if there was no chance of getting back any of the taxes, would be $23,725.36, as ascertained by the special examiner in the manner already stated. But there is a chance, and a very good chance at that, that defendant, as the result of the payment of the decree in this case, will in effect get back some of this $23,726.36 in the form of a reduction in its tax bill for the year in which the decree is paid. If we now knew the amount of that reduction, and when defendant would get the benefit of it, it would be equitable to ascertain its worth as of the date of the coming in of the examiner's report, and deduct such worth from the taxes already paid, and take the difference from the $50,543.08 the special examiner found to be due by the defendant, and for the balance enter a decree in plaintiff's favor. We do not know what allowance, if any, on its future tax bills, defendant will get in consequence of its payment of the decree to be here passed.

Even under such circumstances, 'it is not impossible to do exact justice. That result can be attained by entering a decree that the defendant shall pay plaintiff $50,543.08, with interest thereon from January 25, 1921, when the special master's report came in, but with the proviso that such decree shall be released upon the doing by defendant of both of two things, namely: (1) The payment to the plaintiff of the difference between $50,543.08 and $23,725.36, that is to say, $26,-617.72, with interest thereon from January 25, 1921, until paid. (2) The delivery to the plaintiff of a bond, with sufficient surety, acceptable to the plaintiff or approved by the court, in the penalty of $23,725.36, conditioned for the payment to the plaintiff of the equivalent of whatever sum, if any, shall be hereafter deducted from the taxes the defendant would otherwise have to pay the United States in consequence of the payment by it of said sum of $26,617.72.

It is possible that some other and simpler form of decree to accomplish the same end may suggest itself to the parties, or either one of them. If so, it can be adopted. In any event, it is likely that the decree will take an unusual form. Equity, however, never becomes too old to conceive and bring forth new remedies or new variants of old.

The defendant is here asking the chancellor, in view of the novel conditions created by our latter-day taxing system, to protect it from the rigidity of old rules. This may be done only upon condition that the aid given defendant shall not take from the plaintiff anything which rightfully belongs to it. The defendant has done the wrong, and it may not profit by its action.