WILLIAM WRIGLEY, JR., CO. v. L. P. LAR-
SON, JR., CO.

(District Court, N. D. Illinois, E. D.   March
14, 1925.)

No. 488.

**1. Appeal and error $\Longleftrightarrow$1195(1)—Scope of de-
cision as law of case.**

Every question of law or fact which was
before an appellate court and decided by its
opinion is conclusively settled for the lower
court in subsequent proceedings, and that
court must proceed in conformity to the man-
date as interpreted by the opinion of the re-
viewing court, which may be consulted to as-
certain what was intended by its mandate.

**2. Appeal and error $\Longleftrightarrow$1195(1)—Decision of
questions on reversal becomes law of case.**

The finality of the decision of an appellate
court, so far as it did decide any question, is
not affected by the fact that it was a judgment
reversing the lower court.

**3. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—Unfair competition; ac-
counting for profits.**

Where it has been authoritatively deter-
mined in a suit that the parties are bound by
allegations and admissions in their pleadings
that their two packages are identical in the
eyes of the trade, and that the purchasing pub-
lic makes no distinction between them, the one
adjudged to have the exclusive right to use such
package is not required to prove, on an ac-
counting by the other for profits, that there
was actual confusion and misleading of ulti-
mate purchasers, and to separate the profits
made on such sales from those made on other
sales; but prima facie he is entitled to re-
cover the profits on all sales, especially where
it was found that the imitation of his package
was deliberate and willful.

**4. Equity $\Longleftrightarrow$409—Weight of findings of mas-
ter on compulsory reference.**

Findings of fact by a master on a reference
made under the equity rules, and not by con-
sent, are not conclusive on the court, but ad-
visory only, and it is the duty of the court
to exercise its own judgment in considering ex-
ceptions thereto; but all findings of the mas-
ter should be taken as presumptively correct,
and should be followed, unless an obvious error
has occurred in the application of the law, or
a serious and important mistake has been made
in the consideration of proofs.

**5. Account $\Longleftrightarrow$19—Party limited on an ac-
counting by the terms of its own decree.**

A party which has tendered and secured the
entry of an interlocutory decree fixing the
terms of an accounting is not entitled to have
its recovery determined on different principles
and measured by a different standard.

**6. Account $\Longleftrightarrow$14—Recovery in equity on an
accounting is compensatory, and not punitive.**

On an accounting in a court of equity, the
recovery must be compensatory, and not pun-
itive, unless there is a statute authorizing the
allowance of punitive damages.

**7. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98 — Unfair competition;
rules governing accounting for profits.**

The rules applicable to assessing damages
at law in cases of willful conversion, or in
determining the rights of a fraudulent gran-
tee, who has improved the property, do not
apply in determining profits which are to be
allowed in an equity suit, as an equitable meas-
ure of compensation for unfair competition.

**8. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—On accounting for profits
of unfair competition, interest on capital
employed is deductible as expense.**

On an accounting for profits in a suit for
unfair competition, interest on the amount of
capital invested in the business, to the extent
of its employment in manufacturing and sell-
ing the offending article, is a proper item of ex-
pense to be deducted.

**9. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—Cost of patents and pat-
ent rights held capital invested in the busi-
ness, on an accounting for profits.**

Where patented machines were necessary
in the manufacture of an article sold in unfair
competition, on an accounting for profits the
amount invested in patents and patent rights
was a part of the capital invested, and interest
thereon is a proper deduction from gross prof-
its.

**10. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—Manufacturer of article
sold in unfair competition held not entitled to
interest on good will as a deduction from
gross profits.**

Under the peculiar facts of the case, the
manufacturer and seller of an article in unfair
competition, on an accounting for profits, *held*
not entitled to allowance of interest on the
value of the good will of its business as a de-
duction from gross profits.

**11. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—Deductions from gross
profits on accounting for unfair competition;
income taxes paid.**

The manufacturer and seller of an ar-
ticle in unfair competition, which made return
of the profits made as its own and paid the
income and excess profits taxes thereon, *held*
not entitled to deduct the amount from gross
profits on an accounting for the trespass.

**12. Trade-marks and trade-names and unfair
competition $\Longleftrightarrow$98—Interest on recovery of
profits made in unfair competition allowed
from filing of master's report.**

On an accounting for profits made in un-
fair competition, interest is allowable on the
amount awarded from the date of filing of the
master's report.

**13. Corporations $\Longleftrightarrow$378—Decree for account-
ing by corporation for profits from unfair
competition held not to require accounting
for separate corporation.**

Under a decree requiring a corporation to
account for profits made from the sale of an
article in unfair competition, it cannot be re-
quired to account for profits made by another

corporation, separately controlled by its own stockholders and directors, merely because the stockholders of the two are the same.

In Equity. Suit by the William Wrigley, Jr., Company, against the L. P. Larson, Jr., Company. On exceptions to master's report on an accounting under defendant's counterclaim. Exceptions sustained in part, and decree entered.

Isaac H. Mayer and Wallace R. · Lane, both of Chicago, Ill., for plaintiff.

Charles H. Aldrich, George I. Haight, and Frank F. Reed, all of Chicago, Ill., for defendant.

WILKERSON, District Judge. This case is now before the court on exceptions to the master's report on an accounting. It has been in the Circuit Court of Appeals twice (253 F. 914, 166 C. C. A. 14; 275 F. 535), and the disposition of the questions now presented requires an examination of those proceedings to determine what has been laid down as the law of this case to be here followed.

The parties are corporations. The plaintiff, and defendant to the counterclaim, will be referred to here as Wrigley Company; the defendant, and counterclaimant, will be referred to as Larson Company. In 1911 Wrigley Company brought suit against Larson Company, charging unfair competition and infringement of trade-mark. It alleged that in 1894 it originated the distinguishing name "Spearmint" in connection with chewing gum products, adopted a novel form of trade dress for its spearmint product, and thereafter extensively advertised the name and dress. It charged that Larson Company had placed on the market under the trade-name "Peptomint" a product with a flagrant and fraudulent imitation of the spearmint trade dress, and that as a matter of fact the purchasing public made no distinguishment between spearmint and peptomint. The bill was verified, and upon the showing made Wrigley Company obtained a temporary injunction, restraining Larson Company from using the label against which complaint was made, or any similar label. This injunction continued in force until the entry of the final decree dismissing the bill.

While the injunction against peptomint was in force, Larson Company brought out its wintermint package and originated the wrappers and color scheme. Wrigley Company in 1914 put on the market its doublemint package, and on June 15, 1915, brought its second suit against Larson Company, the one out of which this accounting proceeding arises. The bill contains substantially the same averments as the first bill with reference to the adoption and use of the distinguishing name "Spearmint," and sets out the granting of the temporary injunction in that case. It further alleges that about July 1, 1914, Wrigley Company placed upon the market a peppermint flavored chewing gum product, and, desiring to distinguish that product by name from all similar flavored chewing gum products then upon the market, adopted and used the trade name or mark of "Doublemint." The bill then states:

"The said defendant first began the sale of its wintermint product subsequent to the time the said doublemint product of your orator came upon the market, and said defendant had never marketed or sold chewing gum in cartons, counter bands, or wrappers in the trade dress of wintermint gum, herein in evidence, prior to the introduction of your orator's doublemint product, and that the said defendant has simulated the style of lettering, peculiar markings, form of carton, form of wrapping, and general color scheme, thereby producing and giving to its style of package, counter band, and wrappers the peculiar visual appearance of both your orator's spearmint and doublemint products, and either of them, and which through long years of usage and great expenditures of money, in advertising, have become the predominating means of designating your orator's well-known spearmint and doublemint products; your orator further averring upon information and belief that a certain number of dealers in chewing gum, both the wholesale jobber and the retail dealer, can be found who have purchased the said packages of chewing gum known as wintermint from the defendant, for the purpose of palming off the defendant's goods upon the public as the goods of your orator, and that these defendants have found, as a matter of fact, that the purchasing public makes no distinguishment between the two packages, and that the wintermint gum product of this defendant can be palmed off on the public and trade generally as either the product spearmint or the product doublemint of your orator."

Larson Company in its answer charged that one Pulver, and not Wrigley Company, was the originator of the spearmint package, that the injunction in the first case was obtained by false testimony, and that Larson Company had been oppressed by Wrigley Company by means of deception willfully and fraudulently practiced upon the

court. As to the doublemint package, Larson Company's answer accepted the averment of the bill as to identity, the allegation being as follows:

"This defendant admits that the purchasing public makes no distinguishment between the packages of doublemint as manufactured and sold by complainant, and the wintermint gum product of this defendant, and that the complainant is able to and does palm off upon the public and trade generally its product doublemint as the wintermint of this defendant."

Larson Company charged, however, that wintermint was brought out by it before Wrigley Company had brought out doublemint; that · Wrigley Company had brought out doublemint for the purpose of undermining Larson Company's established and growing trade in wintermint; and in its counterclaim sought affirmative relief on that basis.

The cases were consolidated for trial in the District Court. The decrees were against Wrigley Company on both of its bills, and in the second case the decree was likewise against Larson Company on its counterclaim. In the Circuit Court of Appeals the decrees against Wrigley Company were affirmed. Speaking of Wrigley Company's claims, based upon the assertion that it was the originator of the spearmint package, the court said: "Wrigley's oppression of his opponent, and his attempt to deceive the court, were ample grounds for refusing him relief in equity."

As to the doublemint package the Circuit Court of Appeals held that the evidence proved with certainty that wintermint was seven months older than doublemint. Upon the issue of confusion the court pointed out that in support of the counterclaim no proof was made of actual confusion, and that with nothing but the packages before them the court would be inclined to concur in the finding of the District Court. The court then said:

"But the record contains also Wrigley's averment in his bill that confusion had arisen. There was no proof to support that averment and Larson's parallel averment. But Larson's counsel may have relied upon the stipulation .of fact in bill and counterclaim to save hunting up and bringing in witnesses of wrongful sales. Furthermore, Wrigley and another interested with him gave testimony as experts in the gum business that confusion was likely to result from the similarities; and so there is a basis for at least the possibility that Wrigley's aver-

ment of fact and his expert opinion may be true, and that Larson's diminished sales came from Wrigley's simulation of the 'wintermint' package. In such a situation, the rule, in our judgment, is this: In a real and legitimate controversy, a party should be left within the knot of his averments in pleadings and admissions in testimony, unless the court can find an absolute demonstration from other evidence in the case, or from facts within judicial notice, like the laws of physics, etc., that under no circumstances could the averments and admissions be true. This is in analogy to the rule respecting the sustaining of a demurrer to a bill for infringement of a patent on account of the invalidity of the patent on its face."

That portion of the decree dismissing Larson Company's counterclaim, therefore, was reversed, and the case remanded to the District Court, with direction to enter an injunction and order an accounting. Upon the filing of the mandate, an interlocutory decree for injunction and accounting was entered on October 14, 1918. The cause was referred to the master, "to take an account of all the gains and profits of William Wrigley, Jr., Company to it accruing or arising from the manufacture and sale of its doublemint gum in the dress hereinbefore enjoined, from its first sale on July 28, 1914, to the date of the entry of this decree, and such further time, not exceeding 90 days, as may be necessary to comply with this decree, and until compliance therewith."

The decree further provides for the employment of accountants to examine Wrigley Company's books and papers, "to ascertain the profits, if any accruing to said company from the sale of doublemint, as contradistinguished from the other brands of gum made by said company during the period, making proportionate deductions for overhead, advertising, and other proper expenditures."

During the progress of the accounting before the master, Wrigley Company contended that the decree for an accounting extended only to territory in which Larson Company had carried on its trade, or in which it had the ability and intention to extend it. Wrigley Company claimed the right to examine the officers and books of Larson Company in support of this contention, and was. sustained by the master. Larson Company finally refused to submit to further examination, and the question was brought before the District Court by certificate, and the ruling of the master was there upheld. From that order of the District Court an appeal was taken to the Circuit Court of Appeals.

A petition also was filed in the Circuit Court of Appeals for a writ of mandamus to require the District Court to control the action of the master.

The Circuit Court of Appeals reversed the ruling of the District Court and awarded the writ. 275 F. 535. The court said: "Inasmuch as the decree specifically directs the master to take an account of all of Wrigley Company's gains and profits from the manufacture and sale of doublemint gum, and submits no other matter for his report, his duty to refrain from excursions should be sufficiently apparent."

The court then proceeded to examine and decide the question whether the territorial limitation issue had been adjudicated. The court held that the injunction had been ordered on the former appeal, in favor of Larson Company, because in Wrigley Company's spearmint suit it had obtained a pendente lite injunction against Larson Company's peptomint gum by willfully deceiving the court, and had thereby oppressed its opponent; that Larson Company, while its trade was stopped by that wrongful injunction, brought out its wintermint gum; that before wintermint trade could be well established Wrigley Company put its doublemint on the market for the purpose of forestalling Larson Company's growing trade in wintermint; that Wrigley Company thereupon sued for an injunction against wintermint on the grounds that doublemint was the older product, and that the two were one and the same in the eyes of the trade; that Larson Company, by answer and counterclaim, agreed with Wrigley Company that the two packages were substantially the same, but asserted that wintermint was the older; that wintermint was in fact the older; that Wrigley Company before adopting and bringing out its doublemint, had knowledge of Larson Company's wintermint; and that both parties were bound by their sworn pleadings, and Wrigley Company additionally by the testimony of its own officers, to the fact that the two articles were one and the same in the eyes of the trade.

The court continued: "Looking to Larson Company's legal rights flowing from these adjudicated issues of fact, we found Larson Company entitled in law and equity to a perpetual and universal injunction against Wrigley Company's doublemint; and in adjudicating that issue of law (or mixed conclusion of fact and law) we necessarily adjudicated the following subordinate or foundational issues, averred in the pleadings and covered by the finding of facts, though we did not deem it necessary to enumerate them: That Larson Company was the owner of the common package and had the exclusive right to make and sell it; that Wrigley Company knowingly and willfully trespassed upon Larson Company's rights; that Wrigley Company was intentionally forestalling Larson Company; that Wrigley Company thereby constituted itself the agent of Larson Company in making and selling the common package that was the property of Larson Company; and that Larson Company was therefore entitled to stop the activities of its self-appointed agent. And although Wrigley Company in its pleadings did not directly tender the territorial limitation issue, that issue was substantially included in Wrigley Company's general denial of Larson Company's allegation that everywhere that Wrigley Company went it was putting Larson Company's product on the market. Now, it is true that the order to the master to take an account of all of Wrigley Company's profits from making and selling doublemint is interlocutory, and therefore no question arising out of such an accounting is reviewable in this court until after the District Court shall finally have disposed of the master's report. But that does not authorize the master to open any question of fact or of law that was adjudicated in the decree of perpetual and universal injunction."

The mandates from the Circuit Court of Appeals required the entry of an order limiting the inquiry before the master to the ascertainment of profits, if any, made by Wrigley Company from the manufacture and sale of doublemint gum in the infringing dress as prescribed in the decree, and directing him to proceed with the accounting in accordance with the opinion of the court. The master, as he makes clear in his report, then proceeded upon the understanding that the Circuit Court of Appeals had considered and decided, not only the right of Larson Company to an injunction universal in its terms, and its right to require Wrigley Company to file an account equally broad in its scope, but also the principles which were to control the accounting. He took the interlocutory decree, in view of the mandate and opinion in the second case, to be in effect an award to Larson Company of all profits arising from the doublemint business.

On that basis he has found that there is due Larson Company $2,860,083.66, with interest at the rate of 6 per cent. per annum from the end of the accounting period, November

12, 1918, to the time of the entry of the final decree. The account, as stated by the master, does not take into consideration doublemint business in Canada, which was done by the Wm. Wrigley Company, Limited, a Canadian corporation, and business done in Australia by Wm. Wrigley Company, Proprietary, Limited, an Australian corporation. The claim against the Australian corporation has been withdrawn, and the claim on account of the business of the Canadian corporation will be hereafter considered.

Larson Company has filed no exceptions to the report. The exceptions of Wrigley Company fall into two general groups. Those of one group question the master's interpretation of the orders and opinions of the Circuit Court of Appeals and the general rules applied by him in determining the liability of Wrigley Company. Those of the other group relate to the rulings of the master with reference to deductions which it is claimed should be made from the gross profits on doublemint in determining the amount of profits to be recovered in this case.

In support of the first group of exceptions Wrigley Company asserts that the master has misconceived the effect of the opinions and orders of the Circuit Court of Appeals; that the questions decided on those appeals were necessarily limited to the right of Larson Company to an injunction and accounting; that the decree for an accounting was interlocutory; that the taking of the account of profits directed by that decree is an entirely different matter from the determination of the right of Larson Company to recover all or a part of such profits; that questions touching the right to the recovery are left open by the Court of Appeals, and should be decided by this court upon the general rules applicable to such recoveries, uncontrolled by anything which the Court of Appeals has said in deciding the right to an injunction and accounting. Insisting upon what it contends are well-established principles in unfair competition cases, Wrigley Company further asserts that Larson Company has failed to sustain the burden of showing that any gains or profits were due to the enjoined dress, or that such profits were incapable of separation, and that the master failed to give consideration to evidence taken and offered, showing that all of the sales and profits of Wrigley Company were made from other causes than the enjoined dress. Complaint is also made that the master refused to allow deductions for

gum marked with the name of Wrigley Company as the manufacturer thereof.

Was the question of the right of Larson Company to recover all the profits on doublemint decided by the Circuit Court of Appeals, so that it is the law of this case, and therefore binding upon this court? We are not dealing here with the application of the rules relative to the law of the case to the effect of previous orders on the later action of the court rendering them in the same case. Messinger v. Anderson, 225 U. S. 436, 32 S. Ct. 739, 56 L. Ed. 1152. Nor do we have the question of the duty of a lower court to follow the opinion of a reviewing court in a case remanded for further proceedings, when, subsequent to the rendition of the opinion, the reviewing court, or a court which has the power to review its orders, has laid down principles of law inconsistent with those stated in the opinion. We have here the plain, direct question of the duty of a lower court to follow the mandate and opinion of the reviewing court, unaffected by any other considerations, and the rule in that respect is clear.

[1] Every question of law or fact which was before the Circuit Court of Appeals and decided by their opinions was thereby conclusively settled for this court upon the subsequent proceedings. The matters not decided on those appeals are open for consideration here; but, so far as questions of fact or law were specifically decided, this court is not at liberty to re-examine any such decided matters, but must proceed in conformity to the mandate as interpreted by the opinion of the reviewing court. No other rule is conceivable, having regard to the putting of an end to litigation. In re Potts, Petitioner, 166 U. S. 263, 265, 17 S. Ct. 520, 41 L. Ed. 994; In re Sanford Tool Co., 160 U. S. 247, 255, 16 S. Ct. 291, 40 L. Ed. 414; Roberts v. Cooper, 20 How. 467, 481, 15 L. Ed. 969; Skillern v. May, 6 Cranch, 467, 3 L. Ed. 220; Brown v. Lanyon Zinc Co., 179 F. 309, 310, 102 C. C. A. 497; Messinger v. Anderson, 171 F. 785, 789, 96 C. C. A. 445; Bissell Carpet Sweeper Co. v. Goshen Sweeper Co., 72 F. 545, 552, 19 C. C. A. 25.

In re Sanford Fork & Tool Co., 160 U. S. 247, it was said at page 256, 16 S. Ct. 291, 293 (40 L. Ed. 414): "The opinion delivered by this court, at the time of rendering its decree, may be consulted to ascertain what was intended by its mandate; and, either upon an application for a writ of mandamus, or upon a new appeal, it is for this court to construe its own mandate, and to act accordingly."

In Bissell Carpet Sweeper Co. v. Goshen Sweeper Co., 72 F. 545, 19 C. C. A. 25, the Circuit Court of Appeals, upon a former appeal, had affirmed a preliminary injunction, but in so doing it had decided questions going to the merits of the case, as well as those relating to the abuse of discretion by the trial judge in granting the injunction. It was held that reference must be made in executing the mandate to the opinion of the court, and that the decision on the questions which were in fact considered and decided became the law of the case, and was binding upon the lower court.

And in Brown v. Lanyon Zinc Co., supra, it was said: "We are requested to reconsider our prior ruling that no infringement resulted from the use of the Cappeau type of furnace with the rabble operating mechanism in an open or uninclosed place underneath the main roasting chamber; but this we may not do. That ruling turned upon the interpretation of the claim in suit, and is now a part of the law of the case, whether it was right or wrong. It was adhered to after due consideration of a timely petition for a rehearing, and the Circuit Court, as in duty bound, has respected and enforced it in the subsequent proceedings. True, it was made upon an appeal from an interlocutory decree granting an injunction, but that did not render it less obligatory upon the Circuit Court, and does not except it from the settled rule that propositions once decided by an appellate court are not open to reconsideration in that court upon a subsequent appeal or writ of error [citing cases]."

[2] Nor is the finality of the decision of the reviewing court, so far as it did decide any question, affected by the fact that it was a judgment reversing the lower court. Mutual Life Ins. Co. v. Hill, 193 U. S. 551, 553, 24 S. Ct. 538, 48 L. Ed. 788; Messinger v. Anderson, supra; Haley v. Kilpatrick, 104 F. 647, 44 C. C. A. 102; Leese v. Clark, 20 Cal. 387. In Mutual Life Insurance Co. v. Hill, supra, it was said at page 553 (24 S. Ct. 539):

"When a case is presented to an appellate court, it is not obliged to consider and decide all the questions then suggested or which may be supposed likely to arise in the further progress of the litigation. If it finds that in one respect an error has been committed, so substantial as to require a reversal of the judgment, it may order a reversal without entering into any inquiry or determination of other questions. While undoubtedly an affirmance of a judgment is to be considered an adjudication by the appellate court that none of the claims of error are well founded, even though all are not specifically referred to in the opinion, yet no such conclusion follows in case of a reversal. It is impossible to foretell what shape the second trial may take, or what questions may then be presented. Hence the rule is that a judgment of reversal is not necessarily an adjudication by the appellate court of any other than the questions in terms discussed and decided. An actual decision of any question settles the law in respect thereto for future action in the case."

In Leese v. Clark, supra, Mr. Justice Field, then Chief Justice of the Supreme Court of California, delivering the unanimous judgment of that court, said:

"The decision of this court on the first appeal became the law of the case, and fixed the right of the parties in this action under their respective grants. 'A previous ruling of the appellate court,' as we held in Phelan v. San Francisco, 'upon a point distinctly made, may be only authority in other cases, to be followed and affirmed, or to be modified or overruled, according to its intrinsic merits; but in the case in which it is made, it is more than authority—it is a final adjudication, from the consequences of which the court cannot depart, nor the parties relieve themselves.' 20 Cal. 39. Such has been the uniform doctrine of this court for years, and, after repeated examinations and affirmations, it cannot be considered as open to further discussion. See Dewey v. Gray, 2 Cal. 377; Clary v. Hoagland, 6 Cal. 687; Gunter v. Laffan, 7 Cal. 592; and Davidson v. Dallas, 15 Cal. 82. Nor is the doctrine peculiar to this court. It is the established doctrine of the Supreme Court of the United States and of the Supreme Courts of several of the states. Ex parte Sibbald v. United States, 12 Peters, 491 (9 L. Ed. 1167); Washington Bridge Company v. Stewart, 3 How. 413 (11 L. Ed. 658); and Russell v. La Roque and Hatch, 13 Ala. 151. And the reason of the doctrine is obvious. The Supreme Court has no appellate jurisdiction over its own judgments; it cannot review or modify them after the case has once passed, by the issuance of the remittitur, from its control. It construes, for example, a written contract, and determines the rights and obligations of the parties thereunder, and upon such construction it affirms the judgment of the court below. The decision is no longer open for consideration; whether right or wrong, it has become the law of the case. This will not be controverted. So, on the

other hand, if, upon the construction of the contract supposed, this court reverses the judgment of the court below, and orders a new trial, the decision is equally conclusive as to the principles which shall govern on the retrial; it is just as final to that extent as a decision directing a particular judgment to be entered is as to the character of such judgment. The court cannot recall the case, and reverse its decision, after the remittitur is issued. It has determined the principles of law which shall govern, and, having thus determined, its jurisdiction in that respect is gone. And if the new trial is had in accordance with its decision, no error can be alleged in the action of the court below. Young v. Frost, 1 Md. 394; McClellan v. Crook, 7 Gill, 338."

In the trial court the bills of Wrigley Company and the counterclaim of Larson Company in the second suit were dismissed for want of equity. The Circuit Court of Appeals, in sustaining the decree against Wrigley Company in the first suit, said: "Wrigley's oppression of his opponent and his attempt to deceive the court were ample grounds for refusing him relief in equity; and in the strict law, when Wrigley is limited, as he must be, to his own name and the spear design for displaying 'spearmint,' Larson is not liable for using his own initials and the oblique banner across the circle for displaying 'peptomint.'"

In the second suit the District Court had held, as stated by the Circuit Court of Appeals, that the distinctive words and marks were so dominating that the careless purchaser, desiring Larson's wintermint would not be misled into taking Wrigley's doublemint. "And," the court continued, "with nothing before us but the packages, we would be inclined to concur in the finding."

The Circuit Court of Appeals then proceeded to consider and decide the question of the effect of the pleadings. In deciding this it was necessary to determine whether the parties by their pleadings agreed upon the issue of actual or probable confusion, and were therefore bound by their averments; and, secondly, whether the court could be compelled to accept and act upon such agreement. Rejecting the view that the court could be compelled to act upon an agreement in the pleadings where the case is moot or feigned or collusive, the Circuit Court of Appeals found that, in view of the testimony adduced by Wrigley Company at the trial, the case on the counterclaim could not be regarded as moot or feigned or collusive, and that the

parties were bound by the stipulation of fact in the bill and counterclaim. The averment which the Circuit Court of Appeals held to be binding upon Wrigley Company is "that the purchasing public makes no distinguishment between the two packages and that the wintermint gum products of this defendant can be palmed off on the public and trade generally as either the product 'spearmint' or the product 'doublemint' of your orator."

The bill and counterclaim are pleadings upon which the final decree in this case must be entered. They are not limited in their scope to the issue of unfair competition involved in the entry of the interlocutory decree. They are the pleadings upon which the amount of the recovery, if one is had in the case, must be determined. The question of their construction and effect as pleadings in the case (not a fragment of the case, but the whole case) was before the Circuit Court of Appeals, just as the question of the construction and effect of the contract was before the court in Leese v. Clark, supra. The court decided that question, and held that in this suit Wrigley Company is bound by its averment that the purchasing public makes no distinguishment between the two packages.

It is true that, as pointed out in Jones v. Morehead, 1 Wall. 155, 165 (17 L. Ed. 662): "The admission need go no further than its terms necessarily imply." The averment in the bill, however, is one which applies with equal force to every package of doublemint put on the market. It cannot be true as to one, without being true as to all. It is charged that in the eyes of the trade Wrigley Company's doublemint and Larson Company's wintermint are identical. The stipulation in the pleadings here is not analogous to the admission in Jones v. Morehead, supra.

[3] The question of the construction and effect of the stipulation in the pleadings was given consideration and again decided on the second appeal and in the mandamus proceeding. There the question was whether Wrigley Company should be required to account as to sales in territory in which Larson Company had not gone, and in which it had neither the ability nor intention to extend its trade. The Circuit Court of Appeals pointed out that, as the decree specifically directed the master to take an account of all profits, he should have followed that direction. The decree, however, was interlocutory. The master's interpretation of that decree had been upheld by the District Court. The Circuit Court of Appeals, therefore, proceeded to determine whether or not

5 F.(2d)—47

the court and master were following the mandate and opinion on the first appeal. In deciding that question it was for the Circuit Court of Appeals to consider its own mandate, and that construction is, under the authorities above cited, binding upon this court as the law of the case. The Circuit Court of Appeals considered its mandate and opinion on the first appeal as having adjudicated that both parties in this case are bound to the fact that the two articles are one and the same in the eyes of the trade.

Here is a construction of the pleadings in this case, made by the Circuit Court of Appeals in connection with the accounting proceedings. That construction is that, in determining the decree which is to be entered in this case, the two packages, Wrigley Company's doublemint and Larson Company's wintermint, must be treated as identical. Applying that construction of the pleadings to the other facts in the case, the Circuit Court of Appeals held that it had been adjudicated: (1) That Larson Company was the owner of the common package and had the exclusive right to make and sell it; (2) that Wrigley Company knowingly and willfully trespassed upon Larson Company's rights; (3) that Wrigley Company was intentionally forestalling Larson Company; (4) that Wrigley Company was to be treated as the agent of Larson Company in making and selling the common package.

If the opinion of the Circuit Court of Appeals is followed as to the effect of the stipulation in the pleadings in its relation to the other facts of the case, the contentions of Wrigley Company as to the principles which should have been followed by the master cannot ·be accepted. The argument that the Court of Appeals went further in its decisions of the questions before it than it was required to go to sustain the orders which were made does not aid Wrigley Company. The questions were in fact decided, just as questions relating to the validity or infringement of a patent, or the construction of a contract, were decided in the cases above cited, when the decision was not necessary to the determination of the issue immediately before the court, and the decision of the Circuit Court· of Appeals is binding here and must be followed.

And the Circuit Court of Appeals could not have reached the conclusion which it did reach upon the second appeal, and in the mandamus proceeding, without necessarily adjudicating the questions of actual confusion, agency, and willful trespass. Certainly, compliance with the general terms of the interlocutory decree, which was subject to the control of the District Court,.would not have been required by the Circuit Court of Appeals at the expense of months of time and thousands of dollars, as an idle ceremony. And it seems clear that, without adjudicating in Larson's favor the questions which the Circuit Court of Appeals declares it did so adjudicate, there could have been no recovery by Larson Company, in view of the rule stated in Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713, and Straus v. Notaseme Co., 240 U. S. 179, 36 S. Ct. 288, 60 L. Ed. 590, of any of the profits on business outside the so-called common territory.

Let us apply the decision of the Circuit Court of Appeals, upon the questions which it holds were adjudicated, to the objections to the master's report. Wrigley Company asserts that the burden was on Larson Company to show that some profits were due to the enjoined dress, and also to show that such profits were incapable of separation. The Circuit Court of Appeals, however, deciding the question of the construction and effect of the pleadings, has held that the parties to this suit are bound by their sworn pleadings to the fact that the two articles are one and the same in the eyes of the trade. The averment in the bill of Wrigley Company, which was accepted by Larson Company, that the purchasing public makes no distinguishment between the two packages, even if it were not interpreted to apply to all sales of· doublemint by Wrigley Company, certainly under the narrowest construction possible covers some sales. It is a pleading not merely for the purpose of the interlocutory decree. It is the pleading upon which the case is to go to final decree. In any aspect it operates to relieve Larson Company from the burden of showing that some of the sales of Wrigley Company were due to the confusion resulting from its imitation of Larson Company's package.

The impracticability, if not the utter impossibility, of separating the profits on sales in the making of which there was actual deception from those in which there was no confusion, appears, when we consider that it is the effect of the imitation upon the ultimate consumer which controls. In ·Hanover Milling Co. v. Metcalf, supra, the Supreme Court, at page 423 (36 S. Ct. 364), commented upon the test in unfair competition cases as follows: "But Metcalf's purpose to take advantage of the reputation of the Hanover Company's Tea Rose flour is so manifest, and the tendency of the similarity

of the brand and accompanying design, and of the make-up of the packages, to mislead ultimate consumers, is so evident, that it seems to us a case of unfair competition is made out."

In Chickering et al. v. Chickering & Sons et al., 215 F. 490, 497, 131 C. C. A. 538, the Circuit Court of Appeals for this circuit quotes with approval the following rule stated in Wolf Bros. & Co. v. Hamilton-Brown Shoe Co., 206 F. 611, 617, 124 C. C. A. 409, 415, as follows: "It must be presumed that the retail merchant, receiving the shoes in these cartons, knew what shoes he was buying, and from whom. He would have known this in the absence of any carton. The appellee conceives that it has discharged its duty and obligation to the appellant, and to the public, if it has used means which would excuse it from the charge of having deceived its own customers. It says: 'We are not concerned with what the retailer does; we are concerned with how the Hamilton-Brown Shoe Company sells the shoes.' Such is not the law. If a manufacturer or wholesale dealer willfully puts up goods in such a way that the ultimate purchaser will be deceived into buying the goods of another, it is no defense that he does not deceive and has no intention of deceiving the retailer, to whom he himself sells the goods. The question is whether the defendants have or have not knowingly put into the hands of the retail dealers the means of deceiving the ultimate purchaser. Scheuer v. Muller et al. (C. C. A.) 74 F. 225, 20 C. C. A. 161; Dennison Mfg. Co. v. Thomas Mfg. Co. (C. C.) 94 F. 651; National Biscuit Co. v. Baker et al. (C. C.) 95 F. 135; Fairbank Co. v. Bell Mfg. Co., 77 F. 869, 23 C. C. A. 554; Revere Rubber Co. v. Consolidated Hoof Pad Co. (C. C.) 139 F. 151; Lever v. Goodwin, L. R. Ch. Div. 1; Gulden v. Chance et al. (C. C. A.) 182 F. 303, 105 C. C. A. 16."

In view of the millions of ultimate consumers of the product here under consideration it would be impossible to separate the cases covered by the stipulation of fact in the pleadings, if that stipulation is considered not to extend to all sales, from those cases in which there was no confusion. It must be borne in mind, also, that the Circuit Court of Appeals has adjudicated that Wrigley Company's imitation was deliberate and willful. The rule concerning the recovery of profits in cases of deliberate and willful infringement or imitation is stated in Hamilton-Brown Shoe Co. v. Wolf Bros., 240 U. S. 251, 261, 36 S. Ct. 269, 273 (60 L. Ed. 629), as follows:

"And it is to be remembered that defendant does not stand as an innocent infringer. Not only do the findings of the Circuit Court of Appeals, supported by abundant evidence, show that the imitation of complainant's mark was fraudulent, but the profits included in the decree are confined to such as accrued to defendant through its persistence in the unlawful simulation in the face of the very plain notice of complainant's rights that is contained in its bill. As was said by the Supreme Court of California in a similar case (Graham v. Plate, 40 Cal. 593, 598, 6 Am. Rep. 639, 640): 'In sales made under a simulated trade-mark it is impossible to decide how much of the profit resulted from the intrinsic value of the commodity in the market, and how much from the credit given to it by the trade-mark. In the very nature of the case it would be impossible to ascertain to what extent he could have effected sales and at what prices, except for the use of the trade-mark. No one will deny that on every principle of reason and justice the owner of the trade-mark is entitled to so much of the profit as resulted from the use of the trade-mark. The difficulty lies in ascertaining what proportion of the profit is due to the trade-mark, and what to the intrinsic value of the commodity; and as this cannot be ascertained with any reasonable certainty, it is more consonant with reason and justice that the owner of the trade-mark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant. It is the same principle which is applicable to a confusion of goods. If one wrongfully mixes his own goods with those of another, so that they cannot be distinguished and separated, he shall lose the whole, for the reason that the fault is his; and it is but just that he should suffer the loss, rather than an innocent party, who in no degree contributed to the wrong.' To the same effect are Avery v. Meikle, 85 Ky. 435, 448, 7 Am. St. Rep. 604, 610; El Modello Cigar Co. v. Gato, 25 Fla. 886, 915, 23 Am. St. Rep. 537, 544, 6 L. R. A. 823, 829; Regis v. Jaynes, 191 Mass. 245, 249, 251; Shoe Co. v. Shoe Co., 100 Me. 461, 479; Saxlehner v. Eisner & Mendelson Co., 138 F. 22, 34."

In Globe-Wernicke Co. v. Safe-Cabinet Co. (Ohio) 144 N. E. 711, 713, there is the following statement of the rule:

"The rule governing the rights of parties and the rule as to the measure of recovery, in cases of infringement of patents and cases of unfair competition, are quite similar, as disclosed in many authorities, among

which the following may be cited: Singer Manufacturing Co. v. June Manufacturing Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 21 S. Ct. 7, 45 L. Ed. 60; Hamilton-Brown Shoe Co. v. Wolf Bros. Shoe Co., 240 U. S. 251, 36 S. Ct. 251, 60 L. Ed. 629; Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713; Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365. Many other cases have been cited dealing with this proposition, from a consideration of which the rule may be deduced that where the wrong consists of such an infringement of a trade-mark of another or such an imitation or simulation of the adopted name or the distinctive design, decoration, and appearance of the manufactured article of another, as to result in unfair competition, and the infringement or imitation is shown to be deliberate and willful, the injured party is entitled to recover all the profits realized by the offending party upon the manufactured articles in question. * * * Cases in addition to those heretofore cited to the effect that under such circumstances the court will not undertake to apportion the profits gained from the manufacture and sale of such infringed or imitated product are Benkert v. Feder (C. C.) 34 F. 534; Graham v. Plate, 40 Cal. 593, 6 Am. Rep. 639; Callaghan v. Myers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547; Saxlehner v. Siegle-Cooper Co., 179 U. S. 42, 21 S. Ct. 16, 45 L. Ed. 77; Regis v. Jaynes, 191 Mass. 245, 77 N. E. 774; and Lynn Shoe Co. v. Auburn-Lynn Shoe Co., 100 Me. 461, 62 A. 499, 4 L. R. A. (N. S.) 960."

Another ground of objection to the master's report is the refusal of the master to receive and consider testimony tending to show that the ultimate purchasers bought doublemint because they desired the products of Wrigley Company, that each purchaser understood he was buying the product of Wrigley Company, and that Wrigley Company's sales of doublemint gum were due to the merits of its products, its reputation, and extensive advertising of doublemint, the use of the Wrigley name, trademarks, wrappers, boxes, labels, coupons, etc., and were not due to any confusion or deception resulting from Wrigley Company's alleged imitation of Larson Company's package. Reliance is placed upon Straus v. Notaseme Co., supra. The Supreme Court there says that, where unfair competition is

shown, it does not follow that defendants are chargeable with profits as a matter of course. The court continued:

"So far as purchasers bought because the petitioners recommended the goods, or on the strength of the name, by whatever recommended, as distinguished from the colors and figures of the label, or from knowledge of the specific article, or from preference for full-fashioned over seamless hose, or for any reason but the inducement of the red square, bar and script supposed to indicate the plaintiff's hose, the plaintiff has no claim on the petitioners' profits."

The principles of the Straus Case cannot be applied to sales by Wrigley Company without, in effect, setting aside the findings of the Circuit Court of Appeals upon the questions which it has said were adjudicated by it. In the Straus Case it was stated by the Supreme Court that "the case is wholly devoid of any indication of actual intent to deceive." Here the Circuit Court of Appeals has ruled that the imitation was deliberate and willful, and that the acts of Wrigley Company were fraudulent and oppressive, and has brought the case within the rule stated in Hamilton-Brown Shoe Co. v. Wolf Bros., supra, and Globe-Wernicke Co. v. Safe-Cabinet Co., supra.

In the Straus Case there was an absence of evidence that any deceit or substitution was accomplished in fact. Here the parties, under the ruling of the Circuit Court of Appeals, are bound by the stipulation in the pleadings that the two articles are one and the same in the eyes of the trade, and the Circuit Court of Appeals has adjudged that Larson Company was the owner of the common package. In order to make the principles of the Straus Case applicable here, it is necessary to hold that the stipulation in the pleadings is limited in its effect to the probability of confusion, or at most to actual confusion in a number of cases sufficient to constitute unfair competition, and that the findings of the Circuit Court of Appeals as to the willful, fraudulent, and oppressive character of Wrigley Company's acts are unsustained by proof. Relief against the decision of the Circuit Court of Appeals cannot be obtained here. It is the duty of this court to give effect to that decision, and to enter the decree to which in law it necessarily leads.

As to the objection on the ground that the master failed to exclude profits on doublemint gum marked with the name of Wrigley Company as the manufacturer thereof, it is

clear that Wrigley Company was in no position to raise that question before the master. The averment of confusion and deception in Wrigley Company's bill was general in terms. No distinction was drawn between the packages on which Wrigley Company was described as manufacturer and those on which, although its name appeared there, it was not so described. The entire wrapper is not annexed to the interlocutory decree, but in the petition for certiorari filed in the Supreme Court the package on which Wrigley Company is described as manufacturer is treated as the one which is covered by the pleadings and which was before the Circuit Court of Appeals. The finding of the Circuit Court of Appeals that the packages were one and the same in the eyes of the trade applies without doubt to all doublemint packages, regardless of the designation of Wrigley Company as manufacturer on the package. The case having been tried in the District Court and presented to the Circuit Court of Appeals on the theory that there was no substantial difference between the doublemint packages arising from the designation of Wrigley Company as manufacturer on some of them, the parties will not now be permitted to depart therefrom. M., K. & T. Railroad Co. v. Wilhoit, 160 F. 441, 443, 87 C. C. A. 401, and cases cited.

The remaining exceptions relate to the deductions from gross profits made by the master in determining the profits of Wrigley Company on doublemint, pursuant to the directions of the interlocutory decree.

[4] A preliminary question arises as to the weight which is to be given to the master's report. Counsel for Larson Company, citing Davis v. Schwartz, 155 U. S. 631, 636, 637, 15 S. Ct. 237, 39 L. Ed. 289, and kindred cases invoke the rule that, so far as the findings depend upon conflicting testimony, or upon the credibility of witnesses, or so far as there is any testimony consistent with the findings, the master's report must be treated as unassailable. This is the rule in cases in which there has been a reference by consent to report the facts of the case.

The reference here, however, cannot be treated as a consent reference within the meaning of the cases just referred to. The interlocutory decree was entered pursuant to the mandate of the Circuit Court of Appeals. The reference to the master to take the account was in accordance with the 59th Equity Rule. Consent to the form of the order, or to the master who was to take the account, was not a consent to the reference.

The reference was required by the mandate and the rule of court. Objection would have been futile. The parties did not agree upon a special tribunal for the settlement of their controversy. They went before the master under the compulsion of the mandate and the equity rule.

While the findings of fact in the report of the master upon a reference taken pursuant to the rule applicable in matters of accounting are not unassailable, and while in a sense they are advisory only, they do have every reasonable presumption in their favor, and are not to be set aside or modified, unless there clearly appears to have been error or mistake on the part of the master. There can be no doubt as to the duty of the court with reference to the exceptions to the report of the master on such a reference. The parties are entitled to have the exceptions considered and to invoke the deliberate judgment of the court thereon. Of course, the findings of both law and fact in the master's report should be taken as presumptively correct, and should be followed, unless an obvious error has occurred in the application of law, or a serious and important mistake has been made in the consideration of proofs. Kimberly v. Arms, 129 U. S. 512, 523, 9 S. Ct. 355, 32 L. Ed. 764; Computing Scale Co. v. Toledo Computing Scale Co. (C. C. A.) 279 F. 648; Empire Rubber & Tire Co. v. De Laski & Thropp Co. (C. C. A.) 281 F. 1; Continuous Glass Press Co. v. Schmertz Wire Glass Co., 219 F. 199, 205, 135 C. C. A. 85; Mastin v. Noble, 157 F. 506, 85 C. C. A. 98.

The master found that the total sales of doublemint throughout the accounting period amounted to $8,917,286.90; that the manufacturing cost thereof was $3,764,597.58, leaving as gross profits thereon $5,152,689.32. From the amount of gross profits the master made deductions as follows:

| | |
|---|---|
| Advertising | $996,127.45 |
| Overhead expenses | 915,506.09 |
| Loss on sale of merchandise with doublemint | 12,258.41 |
| Loss by fire at Balize | 1,700.30 |
| Cost of printing United Profit-Sharing coupons | 7,453.38 |
| Amount paid for United Profit-Sharing coupons | 332,946.71 |
| Contingent liability for unredeemed United Profit-Sharing coupons | 98,519.06 |

The master also charged Wrigley Company with $71,905.74 for doublemint's share of interest and dividends received on bank balances, loans, and investments. The master

disallowed Wrigley Company's claim for deductions as follows:

Interest on capital invested in tangible assets....................$304,489.89
Interest on capital invested in patents and patent rights.......... 52,804.27
Interest on good will............. 290,454.91
Depreciation of patents and patent rights ...................... 64,267.43
Federal income and excess profits taxes ....................... 621,108.97

In passing upon these exceptions it becomes necessary to determine the general rule by which the accounting of profits is to be governed. It must be borne in mind that the Circuit Court of Appeals has made no award in this case. It did not undertake to prescribe the final decree which is to be entered. On the contrary, it declared that no question arising out of the accounting "is reviewable in this court until after the District Court shall finally have passed on the master's report." The Circuit Court of Appeals did decide certain questions involved in this case, and this court, in entering the final decree, must give effect to that decision. The Circuit Court of Appeals has laid down as the law of this case that "the two articles are one and the same in the eyes of the trade," and that Wrigley Company had constituted itself "the agent of Larson Company in making and selling the common package." No special rule was prescribed in this case for making deductions from the gross amount of the sales in determining the amount of profits which Wrigley Company, as the self-constituted agent of Larson Company, is to be required to turn over to Larson Company.

[5] Counsel for Larson Company assert that all exceptions on the ground of the failure of the master to make deductions for expenses, or on the ground of the inadequacy of the deductions allowed by him, must be overruled, for the reason that Larson Company is entitled to a decree for the entire gross profits. They assert that, while no exceptions have been taken by them to the master's report on the accounting, it is their intention to attack in the reviewing courts the interlocutory decree, because it authorizes the deductions for overhead, advertising, and other expenses. Wrigley Company, they claim, was a wanton, malicious trespasser, and is subject to a different rule when required to account for profits as a trustee ex maleficio than the one which is applicable to a trustee ex maleficio who is an accidental or careless trespasser. They invoke the rule as to the measure of damages for the willful conversion of property. It is stated in Pine

River Logging Co. v. United States, 186 U. S. 279, 293, 22 S. Ct. 920, 926 (46 L. Ed. 1164) referring to Wooden-Ware Co. v. United States, 106 U. S. 432, 1 S. Ct. 398, 27 L. Ed. 230, as follows: "It was held that, where the trespass is the result of inadvertence or mistake and the wrong was not intentional, the value of the property when first taken must govern, or, if the conversion sued for was after value had been added to it by the work of the defendant, he should be credited with this addition. Upon the other hand, if the trespass be willfully committed, the trespasser can obtain no credit for the labor expended upon it, and is liable for its full value when seized."

They also invoke the rule that one to whom a fraudulent conveyance has been made cannot be reimbursed as against creditors of the grantor for his repairs or improvements made or incumbrances lifted by him whilst in his possession. Railroad Company v. Soutter, 13 Wall. 517, 523, 20 L. Ed. 543; Burt v. C. Gotzian & Co., 102 F. 937, 43 C. C. A. 59.

The interlocutory decree here was entered at the instance of Larson Company. The Circuit Court of Appeals said in its second opinion: "But Larson Company was actor, was in control of its own side of the litigation, and neither Wrigley Company, nor the master, nor the District Court, in view of the decree as entered, could properly compel it to litigate the 'undermining of its trade' —a matter that it had waived in this court by its briefs and in the District Court by its tender of form of decree."

[6] If the position of Larson Company is correct, the long accounting proceeding was unnecessary. There was no controversy as to the amount of the gross sales and the manufacturing cost. No application was made to modify the interlocutory decree. It cannot be that under the rules of equity procedure Larson Company, having adopted the basis for relief set out in the form of interlocutory decree which it tendered, and having obtained an accounting on that basis, will be heard to say that it is entitled to have its recovery determined upon different principles and measured by a different standard. It must be borne in mind that this is an equitable proceeding, in which the court, having obtained jurisdiction upon the claim of right to an injunction, retains it for the purpose of administering complete relief. In such a proceeding the recovery must be compensatory, and not punitive, in this court, unless there is a statute which expressly authorizes the allowance of punitive damages.

In United States v. Bernard et al., 202 F. 728, 732, 121 C. C. A. 190, 194, Judge Gilbert, speaking for the Circuit Court of Appeals for the Ninth Circuit, said: "In actions of trespass, where the injury is wanton or malicious, or gross and outrageous, or is done against the protest of the plaintiff, or in known violation of the law, the court may permit the jury to add to the measured compensation of the plaintiff further damages by way of punishment or example, the amount thereof to be left to the jury's discretion, in view of the special, peculiar circumstances of the case. But the function of a court of equity goes no farther than to award as incidental to other relief, or in lieu thereof, compensatory damages. It has no authority to assess exemplary damages. By applying to a court of equity for relief, the complainant waives all claim to vindictive damages."

In Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U. S. 251, 259, 36 S. Ct. 269, 272 (60 L. Ed. 629), the Supreme Court, in a case in which the infringement was willful and deliberate, said: "The infringer is required in equity to account for and yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust. Not that equity assumes jurisdiction upon the ground that a trust exists. As pointed out in Root v. Railway, 105 U. S. 189, 214, and Tilghman v. Proctor, 125 U. S. 136, 148 (patent cases), the jurisdiction must be rested upon some other equitable ground—in ordinary cases, as in the present, the right to an injunction—but the court of equity, having acquired jurisdiction upon such a ground, retains it for the purpose of administering complete relief, rather than send the injured party to a court of law for his damages. And profits are then allowed as an equitable measure of compensation, on the theory of a trust ex maleficio." (See, also, Computing Scale Co. v. Toledo Computing Scale Co., supra.)

In Christiensen et al. v. National Brake & Electric Co., —— F. (2d) ——, [1]decided August 14, 1924, District Judge Geiger said: "It is my understanding that the popular characterization of an infringer as a trustee ex maleficio is referable properly to the origin of his liability; that is, his situation is analogous to that of a trustee, but arising through his wrong. He is viewed as one who has profited through wrongful appropriation of a right, and is therefore called upon to account upon the principles applicable to

one against whom the liability to account is initially, contractually, or by other express act or assent, created. It was not and is not intended, howsoever adequate the popular characterization of the situation may appear, that the principles of stating the account should be novel, or that they should be applied to produce purely punitive results. The law, after all, aims to cast the infringer's profits as profits are cast. Therefore, in respect of interest, the view has obtained that although capital was used to exploit a right appropriated without leave of a patentee, it was still the infringer's capital, interest whereon is allowable, and, quite regardless of whether the infringer actually paid it as upon borrowing. * * * The doctrine of account as upon a trust certainly cannot be introduced merely to punish the wrongdoer by treating as gains actual disbursements which, had the trust been lawfully created, would be recognized."

[7] No reason is perceived why the general equitable principles above stated are not applicable in cases of unfair competition, as well as in suits for the infringement of patents or trade-marks. The rules applicable to assessing damages at law in cases of willful conversion, or in determining the rights of a fraudulent grantee who has improved the property which has come into his possession, do not apply in determining profits which are to be allowed in a decree in an equity suit as an equitable measure of compensation.

The interlocutory decree directed the master to take account of all gains and profits of Wrigley Company accruing or arising from the manufacture and sale of its doublemint gum in the enjoined dress, and he was directed, in ascertaining such profits, to make proportionate deductions for overhead, advertising, and other proper expenses. The mandates of the Circuit Court of Appeals make no award of profits. The interlocutory decree makes no such award. The accounting has been had, and it is now the duty of the court to enter a decree in which, in view of the questions decided by the Circuit Court of Appeals, profits are allowed as an equitable measure of compensation. The deductions for expenses to be made from the gross profits may now be considered separately.

[8] *Interest on Capital.*—In Globe-Wernicke Co. v. Safe-Cabinet Co., supra, an unfair competition case in which the imitation was found to be deliberate and willful and with intent to deceive, the court said: "Should the defendant have been credited with interest upon the portion of its capital

---

[1] Held for supplemental opinion.

employed in the branch of its business devoted to the production of the sales in question? * * * Concededly, if the capital employed in the manufacture of these products had been borrowed, the interest upon such indebtedness would necessarily be regarded as an item of expense, and consequently considered in determining the net profits of the business. The only objection of any force to the allowance of such item of deduction is that the defendant is thereby permitted a profit from the transaction; but it seems clear that the results are the same, whether the defendant applies to such production money which it would otherwise have invested elsewhere, or goes to a bank and borrows money for the same purpose, for net profits can be ascertained only by deducting the costs of operation, one item of which is interest on the capital actually invested and employed in such production. The profits to be accounted for in such case are not those which might reasonably have been made, but those which were actually realized from the sale of the infringed article. The wrongdoer is not permitted to profit from his own wrong, but actual cost and expense of production and sale should be considered in rendering such account. In determining such profits, interest on capital invested in a business, to the extent of actual employment in the infringing operations, along with other items of expense of production and sale, should be deducted from the gross amount received for such product."

In Computing Scale Co. v. Toledo Computing Scale Co., supra, it was said: "Interest on investment is really the value of the use of defendant's manufacturing plant and selling facilities in making and selling cylinder scales. * * * That such an allowance is a just credit against gross profits, see Western Glass Co. v. Schmertz Wire Glass Co., 226 F. 730, 141 C. C. A. 486 (7th C. C. A.), and Oehring v. Fox Typewriter Co., 251 F. 587, 163 C. C. A. 578 (2d C. C. A.)."

In Western Glass Co. v. Schmertz Wire Glass Co., 226 F. 730, 141 C. C. A. 486, it was said: "The infringer is entitled to deduction from the profits for use of its capital (including plant) invested in the business, to the extent of its actual employment in the infringing operations, and that for such allowance interest may be computed on the value thereof and apportioned for the share of infringing business, whenever noninfringing business is carried on therewith and the share of each is ascertainable."

Interest on the amount of capital invested in the business of Wrigley Company to the extent of its actual employment in the manufacturing and marketing of doublemint gum is a proper deduction for expenses in this accounting. There is nothing in the law of the case as laid down in the Circuit Court of Appeals which forbids it. The interlocutory decree directs the deduction of all proper expenses, and, under the decisions above cited, interest on capital is a proper expense, where the plaintiff elects to take the profits of the infringer or imitator as the equitable measure of his compensation. The evidence returned by the master furnishes a sufficient basis upon which to determine that part of the capital of Wrigley Company which consisted of tangible assets employed in the manufacturing and marketing of doublemint. This clearly appears from an examination of the testimony and an inspection of the exhibits returned with the report.

It is unnecessary to review these tables in detail here. There is no material conflict in the evidence. The rate at which interest should be computed on invested capital is hereby fixed at 6 per cent. During a portion of the accounting period the current rate for interest on loans was more than 6 per cent. Considering the period as a whole, and bearing in mind that the trusteeship arose, not by contract, but by operation of law, and that Wrigley Company was the aggressor, 6 per cent is, under all the circumstances in this case, a reasonable rate. A deduction of $259,120.54 should be made for interest on capital invested in tangible assets.

[9] There is no valid reason why interest on capital invested in patents and patent rights should not be allowed. It was necessary to use machinery to manufacture the gum, and the patents and patent rights were essential in providing the machinery. They were just as much a part of the capital devoted to the operations in doublemint as were the physical machines and the buildings themselves. The evidence as to the proper deduction from gross profits on this account is clear, and involves no material conflict. Taking 6 per cent. as the proper rate of interest, a deduction of $45,260.79 should be made for interest on capital invested in patents and patent rights.

[10] It is true that the good will of a business, while it is sometimes referred to as an intangible asset, is just as real as physical property. In placing a fair value upon the investment in a business, the plant must be considered as a going concern. There is an

element of value in an assembled and established plant doing business and earning money over one not thus advanced. The difficulty here, however, is in determining what part, if any, of the invested capital of Wrigley Company, represented by good will, was employed in the production and making of doublemint gum. Much of this good will was the result of large sums expended in advertising the products of Wrigley Company and in building up a market for them.

We must give effect to the command of the Circuit Court of Appeals that this case is to proceed upon the basis that in the eyes of the trade doublemint and wintermint were the same. Doublemint must be viewed, not as a product of Wrigley Company, but as a product of Larson Company. The creation of the stipulation in the pleadings and the adjudication on the appeal must obliterate the impression of the eye. The selling organization built up by Wrigley Company and the market created by its advertising were, without doubt, effective to some extent in promoting the sales of its imitation of Larson Company's product. But, of course, they were not effective to the same degree as in marketing the products of Wrigley Company. The extent to which they were effective is speculative. No basis exists, in view of the finding of the Circuit Court of Appeals as to the identity of the packages, for making an apportionment, and interest on good will must be disallowed.

*Depreciation of Patents and Patent Rights.*—Wrigley Company claims a deduction of $64,267.43 on this account. In its claim for interest on investment in patents, Wrigley Company charged off for depreciation at the rate of one-seventeenth annually. This was pursuant to a rule of the Treasury Department. Such a rule, however, cannot take the place of evidence of real depreciation. A patent which has a short time to run is frequently more valuable than it was when it was issued. The evidence in support of this claim is insufficient, and the exceptions relating to it will be overruled.

*Deductions for Overhead Expenses.*—The exceptions on this point cover the refusal of the master to make certain allowances, aggregating $54,163.26. Some of those items should have been allowed. They are as follows:

Depreciation on buildings.......... $2,617.52
Tax on essential oils............... 49.17
Salaries and expenses, Brooklyn and Toronto ...................... 560.03

It is clear that the inclusion of these items in manufacturing costs by Wrigley Compa-

ny in its filed account, and the acceptance of the statement by Larson Company with the items included, was due to a mutual mistake of fact. This is a court of equity, and the deductions should be made.

The other items involve questions of fact, upon which the holding of the master will not be disturbed.

As to the claim for Brooklyn moving expenses, it may be said that it appears to be based solely on book entries. It is a claim for damages against the United States in the process of adjustment. The evidence is not sufficient to justify its allowance.

As to the claim for reapportionment for overhead for 1918, this involves an accounting question. The master adhered to the apportionment made on the basis of ledger figures, and refused to accept the revised statement based upon ratio of sales. Any determination of the overhead for a portion of a year is necessarily an approximation only, and the method pursued by the master leads to results which in all probability are as near the real truth as the one which it is urged should be adopted in its place.

The claim on account of payment of notes to Pulver during the accounting period was properly rejected. The purchase was in 1913. It may have eliminated some competition and added to the good will of Wrigley Company. The payments cannot be said to be a part of the overhead expenses of marketing doublemint, which in the eyes of the trade was Larson Company's product. The reasons given for disallowing interest on good will are applicable to this item.

As to the other items relative to overhead, an examination of the record discloses no reason for sustaining the exceptions.

*Contingent Liability for Unredeemed United Profit-Sharing Coupons.*—There is no substantial dispute in the evidence on this point. In the nature of things, exact conclusions cannot be drawn from it. The problem, however, is not more difficult than are many problems with which the courts have to deal. Many times a rule formulated from past experience must be applied to a present situation. The use of mortuary tables is an illustration. In determining the per cent. of these coupons issued in connection with the sales of doublemint which will be redeemed, consideration must be given to the experience of other concerns issuing coupons under trade conditions similar to those in this case. The action of the federal government in the administration of the federal tax laws in permitting the establishment of a reserve of 60 per cent. must be given some

weight. The truth is obviously between the extreme contentions of the parties. The court should proceed with caution in modifying the conclusions of the master on a point like this, but, if it is convinced that due consideration has not been given to all elements, the conscientious performance of judicial duty requires that the modification should be made. I am convinced that the per cent. fixed by the master is inadequate, and that there should be an addition of at least 5 per cent. to the master's percentage of 33⅓ per cent. This makes an additional allowance of $64,715.60 to which Wrigley Company is entitled.

*Advertising.*—The interlocutory decree directed the ascertainment of profits accruing from the sale of doublemint, as contradistinguished from other brands of gum made by Wrigley Company during the accounting period, making proportionate deductions for overhead, advertising, and other proper expenses. The term "proportion" means the portion which falls to one's lot when the whole is distributed according to a rule or principle. The interlocutory decree does not determine the rule or principle by which the expense for advertising is to be apportioned. Obviously, the correct rule is to determine the part of the total amount expended for advertising which was spent by Wrigley Company as the agent for Larson Company in advertising a product which was held by the Circuit Court of Appeals to be Larson Company's product in the eyes of the trade. Here again it is the creation of the stipulation in the pleadings and the mandate of the reviewing court, and not the impression through the eye, which must control. The identity of packages required the allowance of all profits to Larson Company, and in determining the amount of those profits Wrigley Company is entitled to whatever benefits may result from the fact that as Larson Company's agent it was advertising and selling a package identical with that of Larson Company. Whatever amounts were expended in good faith in advertising Larson Company's package are proper deductions here. In view of the equitable principles which must control the determination of profits here, the ground upon which Larson Company has been given all of the profits cannot be shifted, when it comes to fixing the profits, so as to prevent the allowance of proper expenses for marketing what in the eyes of the trade was Larson Company's package.

The master has found that part of the advertising was general or institutional in character. This was obviously correct. As a result of long and patient examination, he has determined the amount of such institutional advertising. In determining the part of such general advertising which should be charged against doublemint, we meet with difficulties analogous to those presented by the claim for interest on good will. The difficulty is in determining how much this advertisement of the Wrigley concern contributed to the marketing of a product which in the eyes of the trade was Larson Company's product. Doubtless it added to Wrigley Company's efficiency to serve as the selling agent for Larson Company's product, but there is a difference between the value of the good will in selling the products of Wrigley Company and that value in selling, as agent, the products of another. By a process of amortization, the master determined the part of this institutional advertising chargeable against doublemint on the basis of the ratio of sale of doublemint to total sales. Larson Company did not except to this determination. There is no basis in this record for any other finding on this subject, and the master's report in this respect will be approved. The amount chargeable to doublemint on account of such institutional advertising is $205,079.78.

When we come to distribute the expense of advertising other than that of a general or institutional character, we must give effect to the identity, found by the Circuit Court of Appeals, upon the pleadings, between the packages of Wrigley Company's doublemint and Larson Company's wintermint. Wrigley Company was advertising Larson Company's package, and expenditures for that purpose, if made in good faith, are proper charges against doublemint. There is no more reason for relieving doublemint from expenses incurred in good faith in advertising that brand than there would be for charging it with expenses for advertising if, in fact, it had not been advertised at all. The record furnishes a basis for determining the amounts expended in good faith in advertising doublemint, after the deductions are made for the general or institutional advertising.

The proper charge against doublemint for the actual quantity of space in newspapers and magazines, in street car cards, in bill posting, on walls, bulletins, and electric signs, and in Mother Goose booklets, is $1,217,640.50. The accountants have agreed upon this figure, if compilations of the witness Stanley are taken as correct, and a careful examination of this record satisfies me that the tabulations on this subject are free

from error which will materially affect this result.

In addition to this, doublemint should be charged with the expenses of the doublemint sample compaign, amounting to $308,219.51. The master's allowance of $72,981.24 of salaries and detail men is approved. Larson Company has not questioned it by exception, and the record discloses no definite basis for any other apportionment.

The allowance of $92,797.21 for doublemint's portion of cost of redemption of war tax rebate certificates is likewise approved.

There remains the item in the master's report in which an allowance is made for doublemint's portion of advertising containing no institutional features. This was determined on a sales basis. Doublemint should be charged, in my opinion, with the actual amount expended in good faith in advertising it. The item in question embraces advertising material, miscellaneous advertising and donations of gum.

The "Mother Goose booklets" are a part of the "advertising material." Allowance has been made for them already, and they have been eliminated from the items now under consideration. The allowance for items now under consideration, which should be made on the basis above stated, is $156,816.73. The total deduction to be made for expense of advertising is $2,053,534.97.

[11] *The Federal Income and Excess Profits Taxes.*—Wrigley Company claims to be entitled to deduct from its profits on doublemint the amount paid for excess and income taxes upon those profits. The amount claimed in the filed account is $563,933.89. Their accountants present a figure of $621,108.97. A revised figure of $372,942.09, which it is claimed is upon the basis approved in Pangborn v. Sly (D. C.) 276 F. 971, is submitted. None of these figures take into consideration the fact that Larson Company will be required to pay a federal tax upon the profits recovered in this proceeding.

Without stopping to point out essential differences between Pangborn v. Sly, supra, and this case, it is sufficient to say that there are controlling reasons why the claim for this deduction cannot be entertained in this equitable proceeding. The rule with reference to taxes on property used in the production and marketing of an infringing product do not appear to be applicable here. Wrigley Company adjusted the tax on its income and profits with the government. In that adjustment it returned the profits on doublemint as its profits. It retained those profits, and has received the benefit of their use. Larson Company has elected to take an accounting of profits as the equitable measure of compensation for the acts of Wrigley Company. Those profits are to be treated as unliquidated, under equitable principles, until the statement of the account has been made and filed by the master. It is equitable that under these circumstances Wrigley Company shall be left in the position in which it has placed itself by its own act in reporting the profits on doublemint as its profits and in settling with the United States on that basis.

*The Charge against Wrigley Company for a Proportion of the Income Arising out of the Investment of Wrigley Company's Profits.*—The master added to the profits for which Wrigley Company is held chargeable an item of $71,905.74, which it is said in the report represents doublemint's share of income arising from the investment of profits, whether considered as invested in the gum business or otherwise. The total miscellaneous income is allocated in the proportion that the accumulated profits of doublemint at the first of each calendar year bear to the total invested capital, excluding intangibles; accumulated doublemint profits being considered as doublemint's investment in the business. Interest on invested capital has been allowed, and under the seventeenth exception an addition of $26,202.73 is proper. An application of the principles under which an allowance for federal taxes has been refused precludes any further addition upon the theory stated by the master. The principles applied in the case should not be shifted, so as to treat the profits as liquidated for one purpose and unliquidated for another purpose.

[12] *Interest on Award.*—The master recommends the allowance of interest from the end of the accounting period. This case is controlled by the general principles of equity. No special statute for increasing the award, as in patent cases, is applicable. B. F. Goodrich Co. v. Consolidated Rubber Tire Co. et al., 251 F. 617, 163 C. C. A. 611, and Malleable Iron Range Co. v. Lee (C. C. A.) 263 F. 896, and kindred cases, are not in point. The decree in those cases was for damages upon the basis of a reasonable royalty. In the case first mentioned the court said: "We see no valid reason for withholding interest where the damages are based upon a reasonable royalty. In fact, precedent, and not the logic of the situation (Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664), is all that prevents the

allowance of interest in case of damages based on the infringer's profits." And precedent must control here.

Larson Company elected the basis of its recovery. When it waived damages and took a recovery of profits, it adopted likewise the equitable principles which control in such a proceeding. Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664; Root v. Railway Co., 105 U. S. 189, 198, 200, 204, 26 L. Ed. 975; Littlefield v. Perry, 21 Wall. 205, 229, 22 L. Ed. 577; Mowry v. Whitney, 14 Wall. 620, 651, 20 L. Ed. 860; Silsby et al. v. Foote, 20 How. 378, 386, 15 L. Ed. 953; Toledo Scale Co. v. Computing Scale Co. (C. C. A.) 281 F. 488; 'Western Glass Co. v. Schmertz Wire Glass Co., 226 F. 730, 141 C. C. A. 486; Munising Paper Co. v. American Sulphite Pulp Co., 228 F. 700, 143 C. C. A. 222; McCourt v. Singers-Bigger, 145 F. 103, 76 C. C. A. 73, 7 Ann. Cas. 287. It would be not only illogical, but inequitable, to charge Wrigley Company with interest from the end of the accounting period, and at the same time refuse to treat the assessment of profits as liquidated in determining the claim for federal taxes. Interest will be allowed on this award at the rate of 6 per cent. per annum from the date of the filing of the master's report.

*Compensation of Accountants.*—The fees of James Hall, accountant, should be taxed as costs in this case. The fees of Touche, Niven & Co. are not allowed as costs. The master's recommendation as to the taxation of compensation of the master's office is approved and costs will be taxed accordingly.

[13] *The Canadian Corporation.*—In January, 1916, "Wm. Wrigley, Jr., Company, Limited," was organized under the laws of Canada, and the property and business of the West Virginia corporation, plaintiff and cross-defendant herein, in Canada, was transferred to the Canadian corporation under a contract which is in evidence in this case. The common stock of the Canadian corporation was distributed among the stockholders of the West Virginia corporation. The Canadian corporation, from the time of its organization, was controlled by its own board of directors elected by its own stockholders.

The master has ruled that the West Virginia corporation shall be required to account for the profits of the Canadian corporation on doublemint in the infringing dress. While the proceedings as to the business of the Canadian corporation were pending before the master, the report now under consideration was filed. The master reserved for further consideration the accounting as to the business of the Canadian corporation, and states, in his report, that it is his intention to make a separate report on that subject. The Wrigley Company objects to this division of the case, and insists that but one final decree shall be entered. It contends that the question of the responsibility of the defendant corporation for the acts of the Canadian corporation and its liability to account for the profits of that corporation was not submitted to the master under the order of reference. It contends, also, that upon the undisputed evidence in the record before the master, which has been reported to the court, the relation between the two corporations did not make the West Virginia corporation liable for the profits of the Canadian corporation, and that Larson Company's remedy for alleged unfair competition by the Canadian corporation is in a suit against that corporation.

The order of reference directed the master to take an account of all the gains and profits of William Wrigley, Jr., Company to it accruing or arising from the manufacture and sale of its doublemint gum in the enjoined dress. The master did not have authority, under this order, to include the profits of the Canadian corporation, unless the business carried on in the name of that corporation was essentially a branch or division of the business of the West Virginia corporation. And, in view of the fact that the corporations were two distinct legal entities, it is questionable whether, under the order of reference, the master was empowered to try out the issue of the relationship of the one corporation to the other. It is very plausibly contended that, if the business of the Canadian corporation is to be brought into this case, that issue should be tried in the first instance by the court upon appropriate pleadings. The master, upon an order for an accounting by the West Virginia corporation of its profits, has undertaken to pass upon the liability of the West Virginia corporation for the acts of another separate and distinct corporate entity.

Was the business of the Canadian corporation a branch or division of the business of the West Virginia corporation, in the sense that the profits of the first may be said to constitute a part of the profits of the second? In answering this question, we must not lose sight of the principle upon which a recovery of profits is allowed in cases like this. The ground of recovery is that they are the benefits which have accrued from the wrongful acts of the defendant, and for

which the defendant is liable, ex æquo et bono, to the like extent as a trustee would be who had used the trust property for his own advantage. The defendant is therefore liable to account for such profits only as have accrued to itself from its wrongful acts, and not for those which have accrued to another, and in which it has no participation. Belknap v. Schild, 161 U. S. 10, 25, 16 S. Ct. 443, 40 L. Ed. 599; Hamilton-Brown Shoe Co. v. Wolf Bros., supra, at page 259 (36 S. Ct. 269).

The mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other, nor does it merge them into a single legal entity, so that the acts of the one are to be treated as the acts of the other. Pullman Car Co. v. Missouri Pacific Co., 115 U. S. 587, 597, 6 S. Ct. 194, 29 L. Ed. 499; Pittsburgh & Buffalo Co. v. Duncan, 232 F. 584, 587, 146 C. C. A. 542.

The application of the principles just stated is further illustrated in Kissinger-Ison Co. v. Bradford Belting Co., 123 F. 91, 59 C. C. A. 221, Prestolite Co. v. Bournonville et ux. (D. C.) 260 F. 446, and Davey Tree Expert Co. v. Frost & Bartlett Co. (D. C.) 300 F. 680. True, the legal fiction of distinct corporate existence will be disregarded, when necessary to prevent fraud, or when a corporation is so organized and controlled and its affairs so conducted "as to make it only an adjunct or instrumentality of another corporation." There is no evidence of fraud in connection with the organization and operation of the Canadian corporation. Under the undisputed facts there is no reason why the two corporations should not be regarded for the purpose of this litigation as distinct legal entities.

The master's ruling in directing the West Virginia corporation to account in this proceeding for the profits of the Canadian corporation was, in my opinion, erroneous. This makes it unnecessary to consider other questions which have been argued with reference to the entry of the decree.

The master's report, except as to the points above indicated, namely, those covered by exceptions 11, 14a, 15, 17, 19, 26, 27b, 27f and 28, is approved.

A decree will be entered for $1,384,649.12, with interest from the date of the filing of the master's report, and costs to be taxed against Wrigley Company.